## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| **(1)  ANDREW CHABALLA, as Next of Kin of LAVERNE SOMERS, Deceased, and ANDREW CHABALLA as Administrator of the Estate of LAVERNE SOMERS** | **Case No.  5:22-cv-00772-F** |
| **Plaintiffs,** | **JURY TRIAL DEMANDED** |
| **v.** | |
| **(1)  SP HEALTHCARE MANAGEMENT LLC** | |
| **(2)  MIDWEST GERIATRIC MANAGEMENT, LLC** | |
| **(3)  JUDAH BIENSTOCK** | |
| **Defendant(s).** | |

### PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES

The Plaintiffs, by and through undersigned counsel, submits this Second Amended Complaint for Damages against the above-named Defendants, and in further support, states and alleges as follows:

**PLAINTIFF**

1.      Laverne Somers ("Resident") died on October 26, 2020, from an avoidable fall and resulting occipital globe fracture at South Pointe Rehabilitation and Care Center, an Oklahoma skilled nursing facility located at 5725 S Ross Ave, Oklahoma City, OK 73119 ("The Facility).  Resident was a resident at Facility from approximately July 22, 2020, through October 22, 2020.

2.      Prior to her death, Laverne Somers was a ***citizen*** of Oklahoma.

3.      Plaintiff, Andrew Chaballa, is, and at all times relevant hereto, an adult over the age of 21 and a citizen of the state of Oklahoma.

4.      Plaintiff Andrew Chaballa is a surviving child of Resident and brings this action on behalf of all wrongful death survivors of the Decedent pursuant to: a) Oklahoma Survivor Statutes, OKLA. STAT. tit. 12, § 1051; and, b) Oklahoma Wrongful Death Statutes, OKLA. STAT. tit. 12, § 1053.

5.      Plaintiff Andrew Chaballa is the duly appointed administrator of the Estate of Laverne Somers as evidenced by the order entered by the District Court of Oklahoma County, entered on December 29, 2020, case PB-2020-1237.

6.      The Estate of Laverne Somers is a ***citizen*** of the state of Oklahoma.

**DEFENDANTS**

7.      Plaintiffs incorporate by reference the allegations previously set forth and further alleges as follows:

**SP HEALTHCARE MANAGEMENT LLC ("SP HEALTHCARE")**

8.      At all times relevant, SP Healthcare Management LLC ("SP HEALTHCARE"), was a limited liability company formed and registered under the laws of the state of Oklahoma who was the licensee, and owned, operated, managed, maintained, and controlled, the Facility.

9.      https://www.medicare.gov/care-compare/details/nursing-home/375365?id=b397e853-05d4-4826-af96-ac128a2b9e67&city=Oklahoma%20City&state=OK&zipcode=&measure=nursing-home-ownership shows the following:



10.      Consequently, SP HEALTHCARE owed a duty to Resident to use reasonable care for Resident's safety while under the care and supervision at the Facility.

11.     The members of SP HEALTHCARE are Judah Bienstock; Baruch Jeremias; 10-26 Nationwide Trust; and South Pointe Realty, LLC.

12.     The 10-26 Nationwide Trust is a traditional trust.

13.     Baruch Jeremias is the trustee of the 10-26 Nationwide Trust.

14.     Baruch Jeremias is a *citizen* of New Jersey.

15.     Thus, the 10-26 Nationwide Trust is a *citizen* of New Jersey.

16.     Judah Bienstock is a *citizen* of Missouri.

17.     Judah Bienstock and Baruch Jeremias are the sole members of South Pointe Realty, LLC.

18.     Thus, South Pointe Realty, LLC is a *citizen* of Missouri and New Jersey.

19.     At bottom, each of the members of the SP HEALTHCARE are citizens of states other than Oklahoma.

**MIDWEST GERIATRIC MANAGEMENT, LLC ("MGM")**

20.     At all times relevant to this action, Defendant Midwest Geriatric Management, LLC ("MGM") was a limited liability company formed and registered under the laws of the state of Missouri, authorized to do business in the State of Oklahoma, and was engaged in providing ancillary medical services to persons requiring such services, including Resident, by managing, maintaining, and controlling the Facility.

21.     At all times relevant, MGM, and/or individuals or entities acting on its behalf, managed, maintained, and/or controlled – in whole or in part – the Facility.

22.     MGM, and/or individuals or entities acting on its behalf managed, maintained, and/or controlled the Facility by providing nursing consulting services and exercising control over:

    a.  Staffing budgets;

    b.  The development and implementation of nursing policies and procedures;

    c.  The hiring and firing of the administrator; and

    d.  Training and supervising nursing staff persons.

23.     These actions and business decisions had a direct impact on the care provided to all residents including Resident.

24.     Consequently, MGM owed a duty to Resident to use reasonable care for Resident's safety while under care and supervision at the Facility.

25.     The only members of MGM are Judah Bienstock and Baruch Jeremias.

26.     Judah Bienstock is a ***citizen*** of Missouri.

27.     Baruch Jeremias is a ***citizen*** of New Jersey.

28.     In sum, each of the members of MGM were residents and citizens of states other than Oklahoma.

## JUDAH BIENSTOCK ("BIENSTOCK")

29.     At all times relevant to this action, Defendant Judah Bienstock ("BIENSTOCK") was and is a Missouri *citizen* and was engaged in providing ancillary medical services to persons requiring such services, including Resident, managing, maintaining, and controlling the Facility.

30.     BIENSTOCK is sued in his individual capacity for his direct participation in the daily operations and management of Facility.

31.     At all times relevant to this action, BIENSTOCK, and/or individuals or entities acting on its behalf, managed, maintained, and/or controlled, in whole or in part, the Facility.

32.     BIENSTOCK, managed, maintained, and controlled the Facility by exercising final authority over:

    a.   Staffing budgets;

    a.   The development and implementation of nursing policies and procedures;

    b.   The hiring and firing of the administrator; and

    c.   Appointing the governing body that is legally responsible for establishing and implementing policies regarding the management and operation of the Facility.

33.     These actions and business decisions had a direct impact on the care provided to all residents including Resident.

34.     Consequently, BIENSTOCK owed a duty to Resident to use reasonable care for Resident's safety while under its care and supervision at the Facility and breached said duty for all the reasons stated in this Complaint.

## DEFENDANTS' JOINT ENTERPRISE/VENTURE

35.     Plaintiffs incorporate by reference the allegations previously set forth and further alleges as follows:

36.     Defendants SP HEALTHCARE; MGM; and BIENSTOCK ("Joint Venture Defendants") were engaged in a joint venture in that:

    a.   The Joint Venture Defendants had an agreement, express and/or implied, among the members of the group to operate the Facility, an Oklahoma licensed nursing home;

    b.   The Joint Venture Defendants had had a common purpose to operate the Facility, an Oklahoma licensed nursing home;

    c.   The Joint Venture Defendants had a community of pecuniary interest in the operation of the Facility, an Oklahoma licensed nursing home; and

    d.   The Joint Venture Defendants had had an equal right to a voice in the direction of the operation of the Facility, an Oklahoma licensed nursing home.

37.     There has been a close relationship between the Joint Venture Defendants at all times relevant.

38.     As a consequence of the joint venture, the Joint Venture Defendants owed a joint duty to Resident to use reasonable care for their safety while under their care and supervision at the Facility.

**JURISDICTION AND VENUE**

39.     Plaintiffs incorporate by reference the allegations previously set forth and further alleges as follows:

40.     The members of defendant SP HEALTHCARE, LLC are citizens of New Jersey and Missouri.  Thus, SP HEALTHCARE, LLC is a citizen of New Jersey and Missouri.

41.     Each member of defendant MGM are ***citizens*** of Missouri and New Jersey.  Thus, MGM is a ***citizen*** of New Jersey and Missouri by way of each of its members being ***citizens*** of New Jersey and Missouri.

42.     Defendant BIENSTOCK is a ***citizen*** of the state Missouri

43.     Plaintiffs are each ***citizens*** of the state of Oklahoma.

44.     Therefore, Plaintiffs bring their claims contained in the Complaint under federal diversity jurisdiction, 28 U.S.C. § 1332(a)(1), as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.  *See Kingdom Life Church, Plaintiff, V. Guideone Specialty Mutual Insurance Company*, Defendant., No. CIV-22-98-F, 2022 WL 348658, at *1 (W.D. Okla. Feb. 4, 2022) ("If plaintiff is an unincorporated association, general partnership, limited partnership, or ***limited liability company***, its citizenship is determined by all its partners or members and the Notice must identify all plaintiff's partners or members and the state or states of citizenship of those partners or members. *See, Americold Realty Trust v. Conagra Foods, Inc.*, 577 U.S.

378, 381 (2016); *Carden v. Arkoma Associates*, 494 U.S. 185, 195-96 (1990); *Spring Creek Exploration & Production Company, LLC v. Hess Bakken Investment, II, LLC*, 887 F.3d 1003, 1014 (10th Cir. 2018). Also, if any partner or member of plaintiff is itself an artificial entity, the Notice must trace the citizenship of that partner or member down through however many layers there may be. *See, Gerson v. Logan River Academy*, 20 F.4th 1263, 1269 n. 2 (10th Cir. 2021). Further, if any member is an individual, the Notice must allege the state of citizenship, as opposed to the state of residence, for that individual.") (citations in original) (emphasis added).

45.    Pursuant to OKLA. STAT. tit. 12, § 2004(F) defendants purposefully availed themselves of the protections and/or benefits of the laws in Oklahoma by committing tortious acts within the state including, but not limited to, failing to ensure that the Facility had appropriate policies and procedures for its nursing staff, was properly capitalized, funded, staffed, and that staff received adequate training and supervision, thereby making jurisdiction proper in this Court.

46.    A substantial part of the events or omissions giving rise to the claims described in the Complaint occurred in this District of Oklahoma, thereby making venue proper in this Court.

## AGENCY

47.    Plaintiffs incorporate by reference the allegations previously set forth and further alleges as follows:

48.    The acts hereinafter described were performed by the agents, representatives, servants, and employees of Defendants and were performed either with the full knowledge and consent of Defendants, and/or were performed by their agents, representatives, servants, or employees during the scope of their agency, representation, or employment with the Defendants.

49.    Furthermore, the acts hereinafter described as being performed by the agents, representatives, servants, or employees of Defendants were performed or were supposed to be performed on behalf of and/or for the benefit of Resident.

## FACTUAL BACKGROUND

50.    Plaintiffs incorporate by reference the allegations previously set forth and further alleges as follows:

### Defendants' Treatment of Resident

51.    Upon admission to the Facility Resident was at risk for falls.

52.    Upon information and belief, none of the Facility staff, nor Defendants conducted a Resident assessment to identify Resident's risk of falls.

53.    Despite Resident's risk, upon information and belief none of the Facility staff, nor Defendants implemented a Care Plan to address Resident's risk of falls, nor did they implement an appropriate care plan to prevent falls.

54.    Resident suffered multiple falls in the weeks and months preceding her fatal October 20, 2020, fatal fall.

55.     Resident died on October 26, 2020, from a right occipital globe fracture that occurred from her avoidable fall on October 20, 2020.

| CAUSE OF DEATH (See instructions and examples) | | Approximate interval: Onset to death | 3 |
|---|---|---|---|
| 34. PART I. Enter the chain of events- diseases, injuries or complications – that directly caused the death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE. Enter only one cause on a line. Add additional lines if necessary. | | | |
| IMMEDIATE CAUSE (Final disease or condition resulting in death ------------→ | a.   COMPLICATIONS OF RIGHT GLOBE FRACTURE STATUS POST REPAIR | UNDETERMINED | |
| | Due to (or as a consequence of): | | |
| Sequentially list conditions, if any, leading to the cause listed on line a. | b.   FALL | UNDETERMINED | |
| | Due to (or as a consequence of): | | |
| Enter the UNDERLYING CAUSE (disease Or injury that initiated the events resulting in death) LAST. | c.   _____ | | |
| | Due to (or as a consequence of): | | |
| | d.   _____ | | |
| 2008068 | Due to (or as a consequence of): | | |

56.     Upon information and belief, during Resident's residency, none of the Facility staff:

   a.   Properly assessed Resident's risk of falls;

   b.   Implemented or provided the appropriate interventions to prevent Resident from falls;

   c.   Monitored or evaluated Resident's Care Plan to see if the interventions prescribed were working; or

   d.   Monitored Resident's fall risk.

57.     Upon information and belief, at no point while Resident was a resident at the Facility did any of the Facility management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from SP HEALTHCARE, MGM, and BIENSTOCK, or any other staff member ever provide any sort of in-service training or clinical education to the Facility staff regarding the assessment, prevention, use of interventions,

monitoring, and reporting of pressure ulcers or skin breakdown in residents like Resident.

58.     Upon information and belief, at no point while Resident was a resident at the Facility did any of the Facility management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from SP HEALTHCARE, MGM, and BIENSTOCK, or any other staff member ever implement the appropriate policies and procedures at the Facility regarding the assessment, prevention, use of interventions, monitoring, and reporting of pressure ulcers in residents like Resident.

59.     Upon information and belief, while Resident was a resident at the Facility, the Facility did not have an adequate amount of staff working on a daily basis at the Facility to meet Resident's needs, perform the interventions required to prevent Resident's avoidable pressure ulcer or prevent the progression of Resident's pressure ulcer, or monitor and adequately supervise Resident's condition.

## Management of the Facility

60.     Most skilled nursing homes substantially derive their revenue and profits from the receipt of taxpayer dollars through the federally funded Medicare program.   Under Medicare, residents with higher acuity levels, i.e., a greater number and greater degree of illnesses, place higher demands for care and services on the facility and its staff.

61.     The rate at which the skilled nursing facilities accepting Medicare dollars for the delivery of nursing care and services, and according the amount of their ultimate revenue and profits, are normally based upon the acuity level of the residents confided to their facilities.   Thus, the higher overall and/or average acuity a facility has, the higher their reimbursement rates will be in general.

62.     For purposes of reimbursement, acuity, the amount of care a resident requires, is measured using a process established by The Center for Medicare Services ("CMS").

63.     This process includes a detailed Resident Assessment Instrument, completed by the facility for each resident as varying intervals depending on the resident's circumstance.

64.     The RAI form is known as a "MDS" (Minimum Data Set) and must be certified to CMS by a registered nurse on behalf of the facility.

65.     The MDS information provided by the facilities for each resident is processed and CMS assigns a corresponding "RUG Score" which indicates a resident's acuity and reimbursement rate.

66.     CMS correlates this RUG, or acuity, score, to an amount of time necessary to meet the needs of that resident.  Averaging the acuity scores for an entire facility, this time is then represented as Hours Per Patient Day, or HPPD.

67.     This number describes the average amount of care giving time each resident in the facility should receive to sufficiently meet their needs.  For example, if a facility has an HPPD of 2.8, that means that each resident should receive 2.8 hours of care time devoted to meeting their needs.

68.     Just as there is a relationship between the RUG scores HPPD, there is also a relationship between RUG scores and reimbursement rates.

69.     The RUG score, the HPPD and the Reimbursement Rates are all based upon the same information provided by the facilities, and the reimbursement rate is directly related to the amount of time a facility should spend caring for that resident.

70.     Therefore, the amount of money a facility receives is based upon the amount of time the facility should spend caring for that resident, all based upon the assessment information the facility certifies as accurate to CMS.

71.     Acuity levels are reflected in the resident's "Resource Utilization Group" classification or "RUGs".  RUGs are mutually exclusive categories that reflect the amount of resources that will be needed in order to meet the needs of a particular resident in a skilled nursing facility.  They are assigned to residents based on data derived from an assessment tool referred to as a "Minimum Data Set" ("MDS").

72.     Based on this MDS, each resident's individual care needs (also called "acuity level") are assigned into a group signifying how much nursing or staff care the resident requires, called a Resource Utilization Group score, or "RUG" score.

73.     A completed MDS contains extensive information on a resident's nursing needs, activities of daily living impairments, cognitive status, behavioral problems, and medical diagnoses.  This information is used to slot the resident into a RUG.

74.     RUGs are organized in a hierarchy from residents who will need the greatest amount of resources to residents who will need the least amount of resources during their stay at the nursing facility.  Residents with more specialized nursing requirements, licensed therapies, greater activities of daily living dependency, or other conditions will be assigned to higher groups in the RUG hierarchy.

75.     MDS's are required to be prepared for each resident of a skilled nursing facility when they initially arrive at the facility and periodically after that depending on the course of the resident's medical progression.  At a minimum, an MDS is to be prepared for every resident in a skilled nursing facility on a quarterly basis.

76.     The completion of an MDS by a skilled nursing facility is a part of the federally mandated process for clinical assessments of all residents in nursing facilities.  It is a core set of screening, clinical, and functional status elements reported on all residents of nursing facilities regardless of who is paying for the resident's stay in the nursing facility.

77.     MDS's need to be as detailed and comprehensive as possible so that they reflect all of the needs of each of the residents in the nursing facility.

78.     When done properly, the MDS provides a comprehensive assessment of each resident's functional capabilities and helps nursing facility staff identify all of the health problems of each of their residents.

79.     Each resident's RUG score is contained in section Z of their MDS evaluation, meaning the total care needs of the residents in any facility at a specific time is available by totaling the residents' RUG scores from their MDS evaluations.

80.     The RUG Score also determines the level of compensation a skilled nursing facility will receive in order to provide the level of care necessary for each of their residents.

81.     Residents in higher RUG categories place higher demands for care and services on the nursing facility and its staff.

82.     Providing care to residents in higher RUG categories is costlier and is, therefore, reimbursed at a higher level.

### Levels of Necessary Care & Expected Staffing

83.     CMS is the federal agency that is tasked with regulating all nursing facilities in this country.  Through the years, CMS has sponsored multiple studies to determine the amount of time that RNs, LPNs, and CNAs in nursing facility spent caring for residents as well as other elements of resident care.

84.     Medicare has commissioned and made available to every nursing home studies and data showing the number of minutes of nursing and nursing aide care a person at a specific RUG level should be expected to require, which Medicare calls "expected staffing."

85.     Because of these studies, CMS is able to set a number of hours of direct care that they expect to be provided to residents by RNs, LPNs, and CNAs based on the nursing Facility's total acuity level.

86.     This expectation is expressed in terms of "hours per patient day" or "HPPD".

87.     With the information gleaned from the MDSs that are provided to CMS by each skilled nursing facility, CMS is able to determine an HPPD that is expected for each nursing facility in the country.  This is referred to as the "expected HPPD" or simply "expected staffing."

88.     When these RUG scores are combined for all residents in a skilled nursing facility, the nursing home knows exactly how many minutes of nursing and nursing aide care should be provided, on average, to meet the expected care needs of their residents.

89.     The only way to determine the total acuity level and corresponding RUG of each of the residents at a facility such as the Facility on any given day is by examining section Z of every MDS in effect on that day.

90.     It is only this empirical data from the MDS Part Z that is necessary to determine the acuity for any particular resident, and thus determine the staffing for a facility.

91.     It is not necessary to disclose or review any residents' information and the relevant information contained in Section Z of the residents' MDS forms can easily be redacted to prevent unnecessary disclosure of HIPPA protected health information.

## Cost Reporting & Staffing Information

92.     Nursing facilities, like the Facility, are required to submit an annual "Cost Report" to CMS, known as "CMS Form 2540-10".  The cost report is a

financial report that identifies the cost and charges related to healthcare treatment activities in a particular nursing facility.

93.    Included with the cost reports are extensive details as to how much money the nursing facility spent on RNs, LPNs, and CNAs.  The cost reports reflect the patient census, hours paid, and the hourly rate that the nursing facility paid each category of direct caregivers.

94.    By dividing the paid hours by the patient census in the facility it is possible to determine how many hours the nursing facility paid for each category of direct caregivers per resident per day for the time period covered by that particular cost report.  This number is referred to as the "reported HPPD".

95.    CMS allows the facilities to include all paid hours in the "reported HPPD."  Thus, that number does actually reflect true direct care hours, but is inflated due to the fact that "hours paid" includes sick pay and vacation pay both of which reduce the amount of actual HPPD provided by caregivers to residents in nursing facilities.

96.    The Facility was also required to report quarterly staffing information through the CMS "Payroll Based Journal" (PBJ) program.

97.    To determine more accurate direct-care hours, it is necessary to examine the data that nursing facilities use to track the number of hours their employees work.  This information is easily accessed through reports that are commonly referred to as "Time Detail Reports", "Punch Detail Data Reports", or some other similarly named report depending on the time-keeping system used by the particular nursing facility.

98.    The more detailed Punch Detail or time records will note vacation or sick time paid and thus, reveal actual hours worked in the facility.  This information reveals a more accurate direct care number and allows the calculation of the actual HPPD for any period of time including a year, a quarter, a month, or a day.

99.    Upon information and belief, the staffing levels reported by the Facility skilled nursing & therapy for the time period Resident was at the Facility were below the CMS expected levels derived from the MDS RUG rates which reflect actual acuity and not simply a resident census.

100.   Upon information and belief, the staffing levels reported by the Facility skilled nursing & therapy for the time period Resident was at the Facility were below the CMS expected levels derived from the MDS RUG rates which reflect actual acuity and not simply a resident census.

### Undercapitalization/Underfunding at the Facility

101.   SP HEALTHCARE, MGM, and BIENSTOCK had a duty to provide financial resources and support to the Facility in a manner that would ensure that each of their residents received the necessary care and services and attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with their residents' comprehensive assessments and plans of care.

102.   SP HEALTHCARE, MGM, and BIENSTOCK had a duty to provide sufficient financial resources to ensure there was enough properly trained and supervised staff to meet the needs of their residents.

103.   Upon information and belief, SP HEALTHCARE had no autonomy to decide their own financial course, including no authority to determine how much staff they could provide or what resources were available to the staff.

104.   Upon information and belief, no individuals at the Facility are involved in decision making about the financial operations or what its resources were and where they would be spent.

105.   Transactions directed by MGM, and BIENSTOCK left the Facility with insufficient cash to provide sufficient qualified staff to meet the individual needs of the residents in their facility during Resident's time there.

### LEGAL BASIS FOR MGM AND BIENSTOCK'S LIABILITY

### Joint Venture/Enterprise

106.   MGM, and BIENSTOCK are collectively referred to herein as the "Corporate Defendants."

107.   The Corporate Defendants directed, operated and managed the day-to-day functions of their nursing facilities – including the Facility – by developing and implementing policies, practices and procedures affecting all facets of the Facility, including resident care.

108.   These policies manipulate and control the physical and financial resources, and prohibit decision making at the Facility level.

109.   This directly affects resident care by determining things such as what type and quality of nourishment is available for residents; what safety measures may and may not be used depending upon cost; the integrity of the building itself; and most importantly, how much staff is available to provide resident care and how well trained and supervised are the staff to meet the needs of the residents.

110.   These policies and practices were developed and implemented without regard to the needs of the residents and, in fact, mandated the reckless disregard for the health and safety of the Facility's residents.

111.   The Corporate Defendants affirmatively chose and decided to establish such operations and demand they be implemented.

112.   Upon information and belief, such operations included, *inter alia*, the following dangerous policies and practices: (a) the aggressive recruitment and admission of high acuity patients to increase the patient census when Defendants had already chosen to understaff the Facility and continually maintain a staff that were not qualified nor competent to provide the care required by state law, regulations and minimum standards of the medical community; and (b) the decision to retain residents whose needs exceeded the qualification and care capability of the Facility's staff.

113.   The Corporate Defendants consciously and in a grossly negligent manner chose not to implement safety policies, procedures and systems which would ensure that: (a) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (b) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

114.   The Corporate Defendants, conduct themselves in a manner which indicates a joint venture/enterprise amongst them, to wit:

      a.   The shared interest in the operation and management of nursing facilities;

      b.   The express and implied agreements amongst them to share in the profits and losses of such venture/enterprise; and

      c.   The obvious actions taken showing the cooperation in furthering the venture/enterprise operating and managing nursing facilities.

115.   Oklahoma law recognizes a joint venture/enterprise where the parties alleged to be partners in such venture/enterprise share a common interest in the property or activity or the joint venture; maintain agreements, either express or implied, to share in profits or losses of the venture/enterprise; and express actions or conduct showing cooperation in the project of the venture/enterprise.

116.   The Corporate Defendants share a common interest in the operation and management of nursing facilities, including the Facility; maintain agreements to share in the profits or losses of the operation of nursing facilities described herein; and operate on a daily basis evincing conduct which indicates their cooperation in the venture of operating and managing nursing facilities for profit.

117.   The Corporate Defendants and SP HEALTHCARE took direct, overt and specific actions to further the interest of the joint enterprise.

118.   These actions were taken through a joint venture/enterprise or through the Corporate Defendants and SP HEALTHCARE's officers, directors, managers and or employees.

119.   The Corporate Defendants had an equal right to share in the profits and to bear liability for, the joint venture/enterprise.

120.   Further, because the Corporate Defendants and SP HEALTHCARE were dominated by each other, these entities had an equal right to direct or control their venture as a whole, as well as to direct or control the operation and management of the Facility.

## Direct Participation/Individual Actions

121.   The Corporate Defendants were at all times material to this lawsuit in the business of managing, owning and operating a network of nursing homes throughout the State of Oklahoma. One such nursing home was the Facility where Resident was admitted for care and treatment.

122.   At all times material to this lawsuit, the Corporate Defendants were fully aware that the delivery of essential care services in each of their nursing homes – including the Facility – hinged upon three fundamental fiscal and operational policies which were dictated by their choices on establishing and implementing such policies: (1) the determination of the numbers and expenditures on staffing levels; (2) the determination of the census levels within the nursing home; and, (3) payor mix.

123.   At all times material, the Corporate Defendants made critical operational decisions and choices which manipulated and directly impacted the Facility's revenues and expenditures.   More particularly, the Corporate Defendants determined:

   a. The number of staff allowed to work in their chains of nursing homes including the Facility;

b.  The expenditures for staffing at the nursing homes including the Facility;

c.  The revenue targets for each nursing home including the Facility;

d.  The payor mix, and, census targets for each nursing home including the Facility;

e.  Patient recruitment programs and discharge practices at each nursing home including the Facility.

124.   All cash management functions, revenues and expenditure decisions at the nursing home level – including the Facility – were tightly managed, directed, and supervised by the Corporate Defendants.

125.   It was the choices made by the Corporate Defendants which directly fixed the circumstances in the facilities and the level of care that could, and was, provided at the homes, including the Facility.

126.   The Corporate Defendants formulated, established and mandated the application and implementation of the policies regarding the staffing levels and expenditures, the census levels, and payor mix.

127.   The census edicts, marketing and admission practices, and resident discharge policies designed and mandated by the Corporate Defendants were implemented and such application was carefully supervised and enforced.

128.   Following the mandates, the Facility functioned in accordance within them, filling empty beds, recruiting high acuity patients, and maintaining a census level and staffing level established and enforced as the Corporate Defendants deemed appropriate.

129. Accordingly, such manipulation by the Corporate Defendants as to staffing and census were motivated by the financial needs of the Corporate Defendants and the Facility as opposed to the acuity levels and needs of the residents as dictated by state and federal laws and regulations.

130. Instead of abiding by their duty to care for the residents, the Corporate Defendants chose to be guided by financial motivation which was simply to increase revenues while restricting and/or reducing expenses.

131. The Corporate Defendants, therefore, directly participated in a continuing course of negligent conduct, requiring the Facility to recruit and retain heavier care, higher pay residents to the Facility even though the needs of the patient population far exceeded the capacity of staff.

132. At the same time, the Corporate Defendants chose to design, create, implement and enforce operational budgets at the Facility which dictated the level of care that could be provided and therefore deprived residents care, creating widespread neglect.

133. In so doing, the Corporate Defendants disregarded, superseded, and violated the duties and responsibilities imposed on a licensed nursing home, in this case the Facility, by the State of Oklahoma, and the federal government.

## Corporate Malfeasance

134.   The Corporate Defendants consciously and in a grossly negligent manner chose not to implement safety policies, procedures and systems which would ensure that: (1) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (2) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

135.   Accordingly, the Corporate Defendants, by their operational choices and decision making, and in order to satisfy their desire to grow profits, created a dangerous condition that caused harm to residents.

136.   These choices to establish and implement such policies and the conscious decision not to implement corrective actions or procedures disregarded the duties which the State of Oklahoma and federal government imposed upon the Corporate Defendants and the Facility.

137.   Because the staffs were below necessary levels, and because the staffs that were present were not properly qualified or trained, the residents at the Facility including Resident, failed to receive even the most basic care required to prevent catastrophic injury and death.  This negligence and resulting injuries ultimately led to and caused Resident's injuries and death as described above.

138.   During Resident's residency at the Facility, Resident sustained physical injuries and died, as described in more detail above, as a result of the acts, omissions, decisions and choices made by the Corporate Defendants in operating the Facility.

139.   During Resident's residency at the Facility, the Corporate Defendants negligently failed to provide and/or hire, supervise and/or retain staff capable of providing Resident with a clean, safe and protective environment, and that, as a result of this failure, Resident suffered neglect, abuse, severe personal injuries, conscious pain and suffering, and deterioration of Resident's physical condition as further described above.  Ultimately, Resident died as a result of this failure.

140.   The Corporate Defendants manage, operate and direct the day-to-day operations of the Facility and these Corporate Defendants are liable for this direct involvement in the operations of such Facility. These Corporate Defendants are therefore liable to the Plaintiffs for the neglect of and injuries to Resident.

141.   The Facility and these Corporate Defendants have been named as Defendants in this lawsuit for their individual and direct participation in the torts and causes of action made the basis of this lawsuit, having:

   a.  Chosen to disregard the duties and responsibilities which the Facility, as a licensed nursing home, owed to the State of Oklahoma and its residents;

   b.  Created the dangerous conditions described by interfering with and causing the Facility to violate Oklahoma statutes, laws and minimum regulations governing the operation of said nursing home;

    c. Superseding the statutory rights and duties owed to nursing home residents by designing and mandating dangerous directives, policies, management and day to day operation of the Facility;

    d. Caused the harm complained of herein; and

    e. Choosing to disregard the contractual obligations owed to the State of Oklahoma and the Federal Government to properly care for the residents in exchange for payment of funds for such care.

### COUNT I - (Ordinary Negligence v. All Defendants)

142. Plaintiffs incorporate by reference the allegations previously set forth and further alleges as follows:

143. At all times material hereto Resident was in a defenseless and dependent condition.

144. Furthermore, Defendants owed a specific duty to comply with those minimum rules and regulations as detailed in *Count Two: Negligence Per Se for Violation of Nursing Home Regulations Imposed by Statute* below. Insomuch as these regulations establish and are probative of the standard of care and the duties owed by defendants to Resident, they are incorporated herein

145. As a result of Resident's defenseless and dependent condition, Resident relied upon Defendants to provide for their safety, protection, care and treatment.

146.   At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendants, and their agents and employees, owed a legal duty to Resident to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

147.   At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing facility.

148.   These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

149.   These duties required Defendants to have sufficient and qualified staff at the Facility nursing home to ensure the proper care for, and treatment of all residents including Resident.

150.   These duties required Defendants to ensure that the Facility's nurses and other staff were properly educated and trained with regard to the care for, and treatment of all residents including Resident.

151.   These duties required Defendants to ensure that the Facility was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

152. Specifically, during the course of their care and treatment of Resident, Defendants and their agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence and carelessly by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by:

    a. Failing to adequately assess, monitor, document, treat, and respond to Resident's physical condition as well as Resident's falls

    b. Failing to adequately assess Resident's risk of falls.

    c. Failing to timely, consistently, and properly monitor, assess, and document Resident's physical condition.

    d. Failing to provide adequate nursing staff to ensure Resident's 24-hour protective oversight and supervision.

    e. Failing to have enough staff at the Facility to ensure Resident's needs were being met regarding fall prevention.

    f. Failing to provide adequate assistive devices and interventions to prevent Resident's falls.

    g. Failing to enact and carry out an adequate Care Plan regarding Resident's increased risk for falls.

    h. Failing to provide adequate assistance and assistive devices to prevent Resident's falls.

    i. Failing to timely report Resident's changes in condition to a physician.

    j. Failing to adequately, timely and consistently prevent, assess, and treat Resident's risk of falls.

    k. Failing to timely transfer Resident to a Facility that could provide adequate care.

l.  Failing to properly supervise and train the employees, agents and/or servants of the Defendant who were responsible for the care and treatment of Resident.

m.  Failing to have and/or implement appropriate policies and procedures regarding the prevention, assessment, and treatment of falls in residents like Resident.

n.  Failing to carry out and follow standing orders, instructions, and protocol regarding the prevention of Resident's falls.

o.  Failing to ensure the assisted living facility was properly capitalized and staffed.

p.  Failing to perform and measure up to the requisite standards of care required and observed by health care providers and further particulars presently unknown to Plaintiffs but which is verily believed and alleged will be disclosed upon proper discovery procedures during this litigation;

q.  Failing to carry out and follow standing orders, instructions and protocol regarding the prevention of Resident's skin breakdown and pressure ulcers;

r.  Failing to ensure the nursing home was properly capitalized.

s.  Failing to perform and measure up to the requisite standards of care required and observed by health care providers and further particulars presently unknown to Plaintiff, but which is verily believed and alleged will be disclosed upon proper discovery procedures in the course of this litigation.

153.   As a direct and proximate result of the individual and collective acts of negligence of Defendants as described above, Resident was harmed and suffered damages, including but not limited to medical bills and expenses, pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; death; and other damages.

154.   As a direct and proximate result of the individual and collective acts of negligence of all Defendants as described above, Plaintiff, suffered damages recoverable by wrongful death beneficiaries under Oklahoma law.

155.   The actions of defendants were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Resident and others, such that, in addition to damages for pain and suffering, defendants are liable for aggravating circumstances damages for their grossly negligent care of Resident.

156.   At the time defendants caused and allowed Resident to develop an avoidable pressure injury and permit the injury to become infected, they knew that their conscious disregard to provide adequate staff and properly capitalize Facility created a high degree of probability of injury to residents, and consciously disregarded in a grossly negligent manner the safety of all residents including Resident.

157.   Accordingly, defendants showed a complete indifference to, or conscious disregard, for the safety of others, including Resident and warrants aggravating circumstances damages be assessed against defendants in an amount that is fair and reasonable and will punish defendants and deter them and others from similar conduct.

158.   As a direct and proximate result of defendant's acts resulting in an understaffed and undercapitalized nursing home, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered damages, including but not limited to pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; death; and other damages

WHEREFORE, Plaintiff, prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including, but not limited to, medical expenses, actual damages and aggravating circumstances damages, the costs of this action, and for such other and further relief as the Court deems just and proper.

### COUNT TWO:  STATUTORY VIOLATION OF ENUMERATED RIGHTS AND NEGLIGENCE *PER SE* UNDER THE NURSING HOME CARE ACT

159.   Plaintiffs incorporate by reference the allegations previously set forth and further alleges as follows.

160.   At all times material to this lawsuit, Facility was under a continuing duty to ensure that their staff was familiar with and complied with all resident rights and duties established under the Nursing Home Care Act, OKLA. STAT. tit. 63, § 1-1901, *et seq*.

161.   More particularly, Facility caused injury and death of Resident by violating the following express rights of Resident, including but not limited to:

a. violating Resident's right to receive adequate and appropriate medical care consistent with established and recognized medical practice standards within the community as established under OKLA. STAT. tit. 63, § 1-1918(B)(5);

b. violating Resident's right established under OKLA. STAT. tit. 63, § 1-1918(B)(12) to be free from neglect and mental abuse;

c. violating Resident's right pursuant to OKLA. STAT. tit. 63, § 1-1918(B)(7) to receive services with reasonable accommodation of the individual needs of RESIDENT; and

d. interfering with Resident's right to be fully informed by her attending physician of her medical condition as established also under OKLA. STAT. tit. 63, § 1-1918(B)(5).

61. Additionally, Facility violated its duties owed to Resident under OKLA. STAT. tit. 63, § 1-1918(D) by failing to provide appropriate staff training to implement the rights set forth above.

162. The above violations, operating singularly and in combination caused injury and death of Resident. Accordingly, Plaintiffs invokes the provisions of OKLA. STAT. tit. 63, § 1-1918(F) seeking all damages recoverable and allowed by law.

163. Furthermore, Facility engaged in acts and omissions which constitute statutory "neglect" within the meaning of: (a) Okla. Stat. tit. 63, § 1-1902(15) which defines "neglect" to mean the failure to provide goods and/or services necessary to avoid physical harm, mental anguish or mental illness; and (b) Okla. Stat. tit. 43A, § 10-103(11) which defines "neglect" to mean:  (1) the failure to provide protection for a vulnerable adult who is unable to protect her or her own interest; (2) the failure to provide a vulnerable adult with adequate shelter, nutrition, health care, or clothing; or (3) negligent acts or omissions that result in harm or the unreasonable risk of harm to a vulnerable adult through the action, inaction, or lack of supervision by a caretaker providing direct services.

164.  By reason of the fact that Facility's intentional or negligent acts or omissions caused injury and death of Resident, said Facility are also liable pursuant to the Nursing Home Care Act, Okla. Stat. tit. 63, § 1-1939(A) and (B). Plaintiffs seeks all damages recoverable and allowed by law under the foregoing statutory provision.

165.  In accordance with Okla. Stat. tit. 63, §1-1902(16), the owner of a nursing home is defined as follows:

> "Owner" means a person, corporation, partnership, association, or other entity which owns a facility or leases a facility.  The person or entity that stands to profit or loss as a result of the financial success or failure of the operation shall be presumed to be the owner of the facility.

166.   Accordingly, Resident's injuries, pain, suffering and death were a direct and proximate result of such statutory violations and negligence *per se* set forth above, operating singularly or in combination.   Furthermore, Plaintiffs would show that such statutory violations and negligence *per se* set forth above, operating singularly or in combination, were direct and proximate causes of the damages described more fully herein.

WHEREFORE, Plaintiffs seeks compensatory, actual and punitive damages described below, which are incorporated herein for purposes of this *Count*, plus cost of suit, and all other relief to which Plaintiffs is entitled by law.

<u>**COMPENSATORY, ACTUAL AND PUNITIVE DAMAGES**</u>

167.   Plaintiffs incorporate by reference the allegations previously set forth and further alleges as follows.

168.   As a direct and proximate result of the acts or omissions of Facility as set forth above, Resident suffered, until her premature death, mental anguish, pain, suffering, physical injuries, extreme physical impairment and other subsequent complications and injuries.

169.   As a further direct and proximate result of Facility's conduct, Resident required medical attention and hospitalization, and incurred liability to pay reasonable and necessary charges for such.

170.   As a direct, natural and proximate result of the acts or omissions of Facility as set forth above, Resident died, thereby incurring reasonable and necessary charges for funeral, administration and related expenses.

171.   As a direct and proximate result of the previously alleged conduct, all of which was negligent, grossly negligent, willful and wanton, outrageous, reckless, malicious, intentional, and/or threatening to human life, Resident was caused to endure pain, suffering, permanent injury, and death. Indeed, Resident suffered personal injury including pain and suffering, mental anguish, emotional distress, extreme physical impairment, and destruction of dignity until her death.

172.   The scope and severity of Facility's consciously indifferent and grossly negligent actions with regard to the welfare and safety of helpless residents such as Resident constitute gross negligence, willful, wanton, oppressive, reckless, malicious and/or intentional misconduct as such terms are understood in law.

173.   Such conduct was undertaken by Facility without regard to the health and safety consequences to those residents, such as Resident, entrusted to their care. Moreover, such conduct evidences such little regard for their duties of care, good faith, and fidelity owed to Resident as to raise a reasonable belief that the acts and omissions by Facility set forth above were the result of conscious, willful, malicious, and intentional conduct for Resident's rights and welfare for which Plaintiffs seeks punitive damages.

174.   Additionally, pursuant to OKLA. STAT. tit. 12, § 1053, due to the consequences of Facility's misconduct, the Wrongful Death Survivors of the Decedent have suffered grief, loss of companionship, attention, guidance, care, protection, training, consortium, cooperation, affection and love. Accordingly, Plaintiffs asserts a claim for past and future damages arising from such events. Plaintiffs is entitled to an award for the full value of the life of the decedent, Resident, and for the mental anguish she and her family experienced in the past and will experience in the future from the catastrophic, permanent, and foreseeably fatal injuries inflicted by Facility and endured by Resident. By reason thereof, Plaintiff, in his representative capacity, is entitled to recover against Facility compensatory, actual and punitive damages based on the foregoing.

175.   Plaintiffs seeks a judgment against Facility for all compensatory, actual and punitive damages which the law allows and which the Court and which the Jury deems just and fair under the facts of this case, plus costs of suit, and any other relief to which Plaintiffs is entitled by law.

176.   Pursuant to the general rules of pleading, OKLA. STAT. tit. 12, § 2008, Plaintiffs asserts that the amount sought as damages for claims set forth herein is in excess of seventy-five thousand dollars ($75,000).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for judgment against the Defendants as follows:

For judgment against all Defendants for actual and compensatory damages for the injuries to and death of Resident, including but not limited to damages for physical injuries, mental pain and anguish, loss of enjoyment, funeral and burial expenses, and expenses for medical care and treatment, all in an amount in excess of $75,000.00

a.  For judgment against all Defendants for the mental anguish, sorrow and grief, and loss of love, affection, comfort, emotional and pecuniary support, and companionship, consortium and burial expenses;

b.  For judgment against all Defendants for punitive damages in an amount in excess of $75,000.00;

c.  For judgment against all Defendants for prejudgment interest, post-judgment interest, and costs of suit; and

d.  For such other relief as may be just and equitable.

### PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE

Respectfully Submitted,

*/s/* Ryan J. Fulda
Ryan J. Fulda
OK Bar Number: 21184
Ryan.fulda@schafferherring.com
**SCHAFFER HERRING PLLC**
7134 South Yale, Ste. 300
Tulsa, Oklahoma 74136
Telephone: (918) 550-8105
Fax: (918) 749-8803

/s/ Jonathan Steele
Jonathan Steele
*Admitted Pro Hac Vice*
**STEELE CHAFFEE, LLC**
2345 Grand Boulevard, Suite 750
Kansas City, MO 64108
Ph: (816) 466-5947
Fax: (913) 416-9425
jonathan@nursinghomeabuselaw.com

**Attorney for Plaintiffs**