1964 Birchwood Park Drive North
Cherry Hill, NJ 08003
January 28, 2024

**Jonathan Steele**
The Steele Law Firm
2345 Grand Blvd, Suite 750
Kansas City, MO 64108
913-608-4133
jonathan@jsteelelawfirm.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

**ANDREW CHABALLA, as Next
of Kin of LAVERNE SOMERS,
Deceased, and ANDREW CHABALLA
as Administrator of the Estate of
LAVERNE SOMERS
Plaintiffs,
v.
(1) SP HEALTHCARE
MANAGEMENT LLC
(2) MIDWEST GERIATRIC
MANAGEMENT, LLC
(3) JUDAH BIENSTOCK
Defendant(s).**

**Case No. 5:22-cv-00772-F**

Re: **Laverne Laura Somers**

In preparation of my report, I reviewed the following materials:

- ❖ Southpoint Rehabilitation and Care Center - 323 pages [2-page]
- ❖ Southpoint Rehabilitation and Care Center – 574 pages
- ❖ Psychoactive Medication Consent – 9 Pages
- ❖ Integris Health (Hospital) – 221 pages [I]
- ❖ Death Certificate 10/26/20

Numbers in brackets refer to PDF file, Bates stamp, or deposition page numbers.

**Southpoint Rehabilitation and Care Center 8/11/16 – 10/22/20**
Laverne Laura Somers, date of birth 10/5/34, had a medical and surgical history of hypertension, panic disorder, psychosis, generalized anxiety disorder, major depressive disorder, dementia, obesity [2-104], vitamin B12 deficiency, anorexia nervosa, extrapyramidal and movement disorder, insomnia, history of falls, lack of coordination, generalized muscle wasting, unsteadiness on the feet, difficulty swallowing, and muscle atrophy [195].

Ms. Somers was a former smoker [I8]. She did not drink alcohol or use recreational drugs [I13].

Ms. Somers participated in a program of occupational [154], speech [159], and physical [162] therapy.

Ms. Somers fell on 3/16/20 **[Fall #1]**. She sustained a bruise on the right knee and right calf [321]. The fall was unwitnessed [321]. The fall occurred at approximately 14:15. Ms. Somers was observed sitting on the floor on her bottom, her legs facing the bed and extended outwards. The nursing assistant reported that she had just changed Ms. Somers, walked out of the room, and observed Ms. Sommer sitting on the floor on her bottom. The resident's walker was next to her. Shoes were on the wrong feet.

Ms. Somers fell on 3/19/20 **[Fall #2]**. The fall was unwitnessed. In the fall, she sustained bruising of the right knee and calf [318].

Ms. Somers fell on 3/30/20 **[Fall #3]** [316]. The fall was unwitnessed. Nurse camp heard a loud noise, looked up, and observed Ms. Somers on the floor, seated on her bottom, leaning to her right side. Ms. Somers told nurse camp that she had hit her head. She complained of pain in the bottom [316].

On 4/1/20, Ms. Somers fell on the floor in front of the nursing station **[Fall #4]**. She reported losing her balance. She hit her head [312]. Nursing staff planned to educate her on fall precautions and encourage her to ask for assistance when needed. The fall was unwitnessed [314].

Ms. Somers fell on 4/3/20 **[Fall #5]**. She was observed sitting on the floor in her room [311]. After falling, she complained of right hip pain [310].

4/13/20 at 20:30, nurse Henderson observed Ms. Sommer's wheelchair under the sink counter. Ms. Somers was walking towards her bed. When Ms. Somers turned around to sit down on the bed, she had not gone back far enough and she fell to the floor landing on her buttocks **[Fall #6]**. Ms. Somers complained of buttock pain [301].

On 5/23/20, Ms. Somers was found sitting on the floor in another resident's room [**Fall #6**] [286]. Her wheelchair was in the bathroom. She did not have nonskid socks on. Ms. Somers was confused and could not describe what happened. Ms. Somers was wheelchair-bound. She was very weak and unsteady [283]. The fall was unwitnessed [285].

On 7/1/20, Ms. Somers was observed sitting on her bottom on the floor **[Fall #7]** [272].

On 7/6/20, Ms. Somers was found sitting on the floor in her room next to her bed **[Fall #8]**. Ms. Somers was nonambulatory [267].

Nursing notes 7/17/20 describe a fall out of bed the night before **[Fall #9]**. She struck the back of her head. She complained of the inability to turn her head left and right because of pain. X-ray of the cervical spine was ordered [265].

On 7/20/20, Ms. Somers fell out of bed, striking her head **[Fall #10]**. She reported head and neck pain [262].

On 7/24/20, Ms. Somers fell **[Fall #11]**, sustaining a compression fracture of the cervical spine. She was placed in a neck collar [258, 259, 260].

On 8/26/20, Ms. Somers' wheelchair tipped over and she fell, she was found lying on the floor on her right side **[Fall #12]**. She was confused and wheelchair bound. She had a history of repetitive falls. She was nonambulatory [240].

9/22/20 physician notes described recent COVID 19 test positivity without symptoms [2-62]. Ms. Somers recently had a C2 [63] cervical fracture but refused to wear her neck brace. She was examined in a manual wheelchair [2-62].

9/30/20 nursing notes described confusion. Ms. Somers wandered around the hall in her wheelchair. "She is a high fall risk... She has been recovering from COVID 19 [221]."

In October 2020, Ms. Somers was dependent upon others for bed mobility dressing, personal hygiene, toileting, and transfers [163-166]. She was incontinent [167]. Medications included Lexapro, melatonin, Klonopin, doxycycline, and Remeron [342-353].

The physician ordered Megace for appetite stimulation on 10/12/20 [213].

Antibiotic eyedrops were initiated 10/13/24 ocular infection [211].

10/14/20 nursing notes indicated that Ms. Somers had been running into things with her wheelchair, mumbling, and seemed more confused than normal. Her physical condition had declined since contracting COVID 19 infection. She was confused and unaware of her clinical situation. Ms. Somers had been smearing feces all over her room and refused to let anyone clean her [207].

Ms. Somers fell on 10/15/21 at 20:30 **[Fall #13]**. Nursing staff heard her calling out. The fall was unwitnessed. She was lying on the floor between the ends of the beds. Her head was at the wall. She told staff that she had fallen out of bed. There was a bruise on the outer lower portion of both buttocks. Nursing staff plan to add a floor mat beside the bed [206].

Ms. Somers rolled from her bed and was found lying on the floor on 10/19/20 as memorialized in a 12:10 nursing note **[Fall #14]**. Nurses commented that she was wheelchair-bound and weak from COVID 19 infection [204].

Ms. Somers fell on 10/19/20 [199] **[Fall #15]**. Ms. Somers had attempted to get up from her wheelchair at 16:45, fell to the floor landing on her left side. She had bruising of the left hip and left face [202, 200]. Doxycycline commenced to treat eye infection [203].

On 10/22/20, the bed was in the low position [168]. She was assisted to the toilet on dayshift. She did not appear sedated.

Ms. Somers fell, striking her right eye on a wheelchair **[Fall #16]** on 10/22/20. She complained of right eye pain. She was bleeding from the right eye [199].

### Integris Health (Hospital) 10/22/20 – 10/23/20
Ms. Somers had a history of a left eye prosthesis.

CT scan showed rupture of the right globe. Ms. Somers was taken to the operating room for emergency surgery under general anesthesia where she was found to have a complex corneal laceration with uveal tissue loss. The surgeon repaired the ruptured right globe and repositioned the uveal contents [21]. The eye was infected [3]. The cornea was clouded [3].

The injury was painful [3, 8]. The potent opiate analgesic fentanyl was administered for pain [17].

Admission weight was 170 pounds carried on a 5'9" frame. Blood glucose was 101. Blood urea nitrogen and creatinine were 18 and 0.74. Hemoglobin was 11.1 [10].

Topical ofloxacin was prescribed at the time of discharge [3].

10/23/20 hemoglobin was 10.4. Blood urea nitrogen and creatinine were 10 and 0.56 [6].

**Southpoint Rehabilitation and Care Center 10/23/20 – 10/26/20**
On 10/26/20, Ms. Somers was found pulseless and without respirations. She did not respond to [196].

**Professional Background**
I received my medical training at the University of Pennsylvania Medical School from 1983-1987, graduating with a medical doctor degree. I participated in a three-year residency program in internal medicine from 1987-1990 at which time I was endorsed by the American Board of Internal Medicine as a board-certified internist. My internal medicine board certification has been maintained continuously from 1990 through the present time based on successful completion of written examinations for the 1990-2000, 2000-2010, 2010-2020, and 2020-2030 time periods. "Physicians certified by the American Board of internal medicine demonstrates that they have the knowledge, skills and attitudes essential for excellent patient care[1]."

"Internal medicine physicians are specialists who apply scientific knowledge and clinical expertise to the diagnosis, treatment, and compassionate care of adults across the spectrum from health to complex illness[2]."

General internists are trained in pathophysiology and pathology of adult medicine. The scope of a general internist is quite broad. General internists see patients with a broad array of problems related to the brain, spine, autonomic nervous system and peripheral motor and sensory nervous systems; hematological disorders; bones, joints, tendons, ligaments, and metabolic bone disease; genetic and inherited disorders; pharmacology; psychiatric illness; oral and dental problems; kidneys and genitourinary system; swallowing disorders; esophagus, stomach, small and large intestine, rectum, and anus; head, eyes, ears, nose, and throat; arteries and veins; endocrine diseases including but not limited to diabetes, thyroid disease, pituitary disease, and adrenal disease; high blood pressure; rheumatological and autoimmune diseases; infectious disease; cardiac valvular, conduction system, arterial, and heart muscle; the lungs, pulmonary vasculature, pleura, and chest wall; and diseases of the skin including rashes, eczema, contact dermatitis, blistering skin diseases, burns, and pressure injuries.

Internists provide pre-operative, perioperative, and postoperative care.

The internist receives training in interpretation of laboratory reports including microbiology, pathology reports, and interpretation of radiographic studies.

---

[1] http://www.abim.org/ (American Board of Internal Medicine)
[2] https://www.acponline.org/about-acp/about-internal-medicine (American College of physician)

The internist, serving as a family physician for adults often provides first-line evaluation of problems associated with this wide variety of organ systems; the internist then decides whether to manage these problems primarily or to seek consultation with surgeons and/or non-surgical specialists to provide care in collaboration with these consultants.

Since completion of my internal medicine residency program in 1990, I have worked as a hospital-based physician from 1990-1995 providing care to thousands of hospitalized patients on the general medical and surgical floors, in the intensive care units, and as a consultant providing infectious disease expertise. From 1995 through the present time, I have provided hospital-based care, have seen patients in an outpatient general internal medicine office setting, and have provided care to thousands of patients in acute, subacute, and extended care nursing facilities. I have provided physician oversight to patients residing in assisted care facilities.

I have served as a medical director of two extended care facilities. In my capacity as medical director, I served as the liaison between physician staff and nursing/nursing assistant staff; between the physician staff and ancillary medical personnel (dietitian, respiratory therapist, restorative nursing aides, physical therapist, occupational therapist, activities coordinator, Minimum Data Set (MDS) coordinator); and between physician staff and nursing home administration. In my capacity as a nursing home attending physician, I participate in fall risk evaluation and implementation of fall risk prevention and injury mitigation strategies/interventions. In my capacity as a nursing home physician, I participate in the pressure sore risk evaluation, risk mitigation strategies/interventions, pressure injury evaluation and treatment.

In my roles as hospitalist, office-based physician, and a physician working in acute, subacute, and extended care facilities, I am routinely called upon by patients and families to render opinions regarding quantity and quality of life issues, to discuss the morbidities and mortality associated with operative and non-operative interventions, to advise on the advisability of operative and non-operative interventions based on a patient's life goals and medical conditions, to discuss end-of-life care, and to provide life expectancy prognoses.

As an office-based physician, I interact with/provide orders and oversight to visiting nurse personnel.

Given my extensive experience as a hospitalist; an office-based physician; a physician working in acute, subacute, and extended care facilities; and my experience as a medical director in long-term care facilities, I am intimately familiar with the standard of care required of physicians, ancillary medical personnel, and nurses in all three settings.

<u>**Definition of Fall**</u>
A "Fall" refers to unintentionally coming to rest on the ground, floor, or other lower level, but not as a result of an overwhelming external force (e.g., resident pushes another resident). An episode where a resident lost his/her balance and would have fallen, if not for staff intervention, is considered a fall. A fall without injury is still a fall. Unless there is evidence suggesting otherwise, when a resident is found on the floor, a fall is considered to have occurred.

**The *Standard of Care* for fall prevention derives from Federal OBRA regulations and community norms for fall prevention.**

<u>**OBRA Regulations**</u>
In 1987, President Ronald Reagan signed into law the first major revision of the federal standards for nursing home care since the 1965 creation of both Medicare and Medicaid. This landmark legislation changed society's legal expectations of nursing home care. Long term care facilities desiring Medicare or Medicaid funding must provide services enabling residents to "attain and maintain their highest practicable physical, mental, and psychosocial well-being."

The Federal Nursing Home Reform Act or OBRA '87 created a minimum set of national standards of care and rights for people living in certified nursing facilities.

Federal OBRA regulations statutes impose a duty upon nursing home caregivers to provide a "safe…homelike environment." (OBRA §483.10)

Federal OBRA regulations §483.21 The facility must develop and implement a baseline care plan for each resident within the first 48 hours of a resident's admission and a comprehensive care plan for each resident that includes measurable objectives and timetables to meet a resident's medical, nursing, and mental and psychosocial needs that are identified in the comprehensive assessment. These services must meet professional standards of quality and be provided by qualified persons.

OBRA §483.25(d) (1) requires that "the resident environment remains as free of accident hazards as is possible."

OBRA §483.25(d) (2) requires that "each resident receives **adequate supervision** and **assistance devices** [Emphasis added] to prevent accidents."

OBRA §483.25 (n) - Bed Rails. The facility must attempt to use appropriate alternatives prior to installing a side or bed rail. If a bed or side rail is used, the facility must ensure correct installation, use, and maintenance of bed rails, including but not limited to the following elements: assessing the resident for risk of entrapment from bed rails prior to installation. Reviewing the risks and benefits of bed rails with the resident or resident's representative in obtaining informed consent prior to installation. Ensuring that the

bed's dimensions are appropriate for the resident's size and weight. Following the manufacturers' recommendations and specifications for installing and maintaining bed rails.

OBRA 483.35 specifies that the facility must have sufficient nursing staff with the appropriate competencies and skills sets to provide nursing and related services to assure resident safety and attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care.

OBRA §483.45 (c) specifies that the facility must employ a licensed pharmacist who reviews each resident's medications monthly and reports any "irregularities to the attending physician and the director of nursing, and these reports must be acted upon."

## 42 CFR 483.25 () Accidents

Interpretive F-tag[3] language for the above regulation explicates 42 CFR 483.25(c) and provides guidance for surveyors seeking to implement OBRA 42 CFR 483.25(h)(1) and (2) Accidents.

Interpretive F-tag language for the above regulation explicates 42 CFR 483.25 (d) and provides guidance.

The explanatory language for F-tag 689 under this regulation provides definitions for avoidable and unavoidable falls:

An "Avoidable Accident" means that an accident occurred because the facility failed to identify environmental hazards and/or assess individual resident risk of an accident, including the need for supervision and/or assistive devices; and/or evaluate/analyze the hazards and risks and eliminate them, if possible, or if not possible, identify and implement measures to reduce the hazards/risks as much as possible; and/or implement interventions, including adequate supervision and assistive devices, consistent with a resident's needs, goals, care plan, and current standards of practice in order to eliminate the risk, if possible, and, if not reduce the risk of an accident; and/or monitor the effectiveness of the interventions and modify the care plan as necessary, in accordance with current professional standards of practice.

An "Unavoidable Accident" means that an accident occurred despite sufficient and comprehensive facility systems designed and implemented to:  identify environmental hazards and individual resident risk of an accident, including the need for supervision; and evaluate/analyze the hazards and risks and eliminate them, if possible and, if not possible, reduce them as much as possible; implement interventions, including adequate supervision, consistent with the resident's needs, goals, care plan, and

[3] OBRA F-tag 323 was subsumed under F-tag 689 in November 2017

8

current professional standards of practice in order to eliminate or reduce the risk of an accident; and monitor the effectiveness of the interventions and modify the interventions as necessary, in accordance with current professional standards of practice.

An "Assistive Device" refers to any item (e.g., fixtures such as handrails, grab bars, and mechanical devices/equipment such as stand-alone or overhead transfer lifts, canes, wheelchairs, and walkers etc.) that is used by, or in the care of a resident to promote, supplement, or enhance the resident's function and/or safety.

"Supervision/Adequate Supervision" is defined as an intervention and means of mitigating the risk of an accident. Facilities are obligated to provide adequate supervision to prevent accidents. Adequate supervision is determined by assessing the appropriate level and number of staff required, the competency and training of the staff, and the frequency of supervision needed. This determination is based on the individual resident's assessed needs and identified hazards in the resident environment. Adequate supervision may vary from resident to resident and from time to time for the same resident.

The explanatory language for F-tag 689 under this regulation calls for evaluation and analysis data to identify specific hazards and risks and to develop targeted interventions to reduce the potential for accidents. Interdisciplinary involvement is a critical component of this process. Furthermore, F-tag 689 calls for implementation of specific interventions to try to reduce a resident's risks from hazards in the environment. The process includes communicating the interventions to all relevant staff, assigning responsibility, providing training as needed, documenting interventions (e.g., plans of action developed by the Quality Assurance Committee or care plans for the individual resident), and ensuring that the interventions are put into action.

The explanatory language for the F-tag under this regulation calls for monitoring to evaluate the effectiveness of care plan interventions. Modification is the process of adjusting interventions as needed to make them more effective in addressing hazards and risks.

Monitoring and modification processes include:
 (1) Ensuring that interventions are implemented correctly and consistently;
 (2) Evaluating the effectiveness of interventions;
 (3) Modifying or replacing interventions as needed and
 (4) Evaluating the effectiveness of new interventions.
An example of facility-specific modification is additional training of staff when equipment has been upgraded, while a resident-specific modification is revising the care plan to reflect the resident's current condition and risk factors that may have changed since the previous assessment.

The explanatory language for F-tag 689 under this regulation asks surveyors for a resident who is at risk for, or who has a history of accidents, falls, or unsafe wandering/elopement, to determine if the facility provided care and services, including assistive devices as necessary, to prevent avoidable accidents and to reduce the resident's risk to the extent possible; to determine if the facility has provided adequate supervision; and for identified hazards/risks, to determine if there are facility practices in place to identify, evaluate and analyze hazards/risks; implement interventions to reduce or eliminate the hazards/risks, to the extent possible; and monitor the effectiveness of the interventions.

The explanatory language for F-tag 689 under this regulation calls for surveyors to review the plan of care to determine if the facility developed interventions based on the resident's risks to try to prevent avoidable accidents, and if the plan was modified as needed based on the response, outcomes, and needs of the resident.

The explanatory language for F-tag 689 under this regulation requires under 42 CFR 483.21, F656, Comprehensive Care Plans that the facility developed a plan of care based on the comprehensive resident assessment consistent with the resident's specific conditions, risks, needs, behaviors, and preferences and with current standards of practice, and that includes measurable objectives and approximate timetables, specific interventions and/or services including necessary supervision and/or any assistive devices needed to prevent accidents to the extent possible.

The explanatory language for F-tag 689 under this regulation requires under 42 CFR 483.21, F656, Comprehensive Care Plan Revision requires that the plan of care be reviewed and revised periodically, as necessary, related to preventing accidents, supervision required, and the use of assistive devices.

The explanatory language for F-tag 689 under this regulation requires under 42 CFR 483.75(g), F865, Quality Assessment and Assurance that a facility's quality assessment and assurance committee has identified issues and developed and implemented appropriate plans of action to correct identified quality deficiencies in relation to hazards, accident prevention, and supervision of residents.

**<u>Ms. Somers's Care: Pathophysiology and Negligence</u>**
Ms. Somers was at risk for falls while a resident at Southpoint Rehabilitation and Care Center because of previous falls, dementia, anemia, generalized weakness, monocular vision, incontinence, and unsteady balance. Lexapro, Klonopin, and Remeron may have further increased fall risk by causing somnolence, unsteadiness, or orthostatic hypotension.

Ms. Somers was at risk for fracture in the event of a fall because of osteoporosis with previous fractures.

10

Ms. Somers had an unwitnessed fall on 7/24/20 sustaining a C2 cervical spine fracture. Given the 10 falls at Southpoint Rehabilitation and Care Center prior to 7/24/20, it was incumbent that Southpoint to develop and implement effective fall prevention and injury mitigation strategies. Nursing notes are largely devoid of information regarding any fall prevention interventions (if any) employed at the time of the 7/24/20. Failure to provide effective fall prevention interventions on 7/24/20 deviated from generally accepted standards of medical/nursing care and violated federal OBRA regulations.

Ms. Somers had a series of falls between 7/24/20 and 10/22/20. On 10/22/20, she fell, rupturing her right globe. Given the repetitive falls at Southpoint Rehabilitation and Care Center between 7/24/20 and 10/22/20, it was incumbent that Southpoint to develop and implement effective fall prevention and injury mitigation strategies. Nursing notes are largely devoid of information regarding any fall prevention interventions (if any) employed at the time of the 10/22/20. Failure to provide effective fall prevention interventions on 7/24/20 deviated from generally accepted standards of medical/nursing care and violated federal OBRA regulations.

Fall prevention interventions could have included (but were not limited to) moving Ms. Somers's room closer to the nursing station, keeping Ms. Somers at the nursing station within line-of-site, more frequent observation, scheduled toileting, bed and chair alarms, motion detectors, Dycem, a tilt-in-space wheelchair, a low bed, floor mats, a perimeter mattress, nonskid footwear, a self-release seat belt, nonskid strips on the floor, and orthostatic blood pressure evaluation. Failure to reassess the Care Plan and upgrade fall prevention interventions after the series of falls at Southpoint Rehabilitation and Care Center deviated from generally accepted standards of medical/nursing care and violated federal OBRA regulations.

**Ms. Somers's Care: Causation**
The blunt force trauma of the 7/24/20 fall caused fracture of the C2.

The blunt force trauma of the 10/22/20 fall caused rupture of the right globe.

**Ms. Somers's Care: Injuries**
The blunt force trauma of the 7/24/20 fall caused fracture of the C2.

Cervical spine fracture was painful.

The blunt force trauma of the 10/22/20 fall caused rupture of the right globe.

Rupture of the right globe was painful.

Rupture of the right globe required operative repair.

**Expenses.**

Costs associated with diagnosis and non-operative treatment of C2 fracture were necessitated by injuries sustained in the fall 7/24/20 at Southpoint Rehabilitation and Care Center.

Costs associated with the Integris Health (Hospital) hospitalization 10/22/20 – 10/23/20 were necessitated by fall with globe fracture on 10/22/20.

My opinions as stated within a reasonable degree of medical certainty/probability.

I reserve the right to amend my opinions as further information becomes available. I reserve the right to expand upon and discuss logical corollaries to the opinions set forth in this report and provide additional opinions in the event I am examined on issues not specifically described in his report during discovery deposition or during cross-examination at the time of trial.

Yours truly,

John Kirby, M.D.

# John Kirby, M.D.
# 1964 Birchwood Park Drive North
# Cherry Hill, NJ  08003

October 12, 2021

Cell: 609-560-5813

e-mail: kirbylegal@comcast.net

# Professional Experience

2011 – Present:  Associate Professor of Medicine in the Department of Medicine, Cooper Medical School of Rowan University. Inpatient floor and critical care medicine through 2011 - 2013; nursing home/rehabilitation hospital patient care, office practice 2011 - present.

2019: Consultant to First Light, Inc. (Urinary Tract Infection Diagnostics)

2016: Consultant to Nabriva, Inc. (Antibiotic development)

2014: Consultant to NJ Attorney General Professional Boards Prosecution Section regarding physician prescription of controlled substances.

2012 – 2014: Consultant to United States Department of Justice. Medical malpractice defense and consultation regarding accommodations required for safe transition to prison life for convicted, but medically ill criminals.

1995 – 6/30/13: Adjunct Associate Professor of Medicine (Coterminus), non-tenure track in the Department of Medicine at University of Medicine and Dentistry of New Jersey - Robert Wood Johnson Medical School at Camden/Cooper Hospital. Inpatient floor and critical care medicine, nursing home/rehabilitation hospital patient care, office practice, teaching of medical students and residents.

2003-2005: Medical Director, Americana Nursing Home.

2003-2004 Medical Director, Sterling Manor Nursing Home.

1990-95: Partner, Andrew R. Schwartz M.D., P.A., Cherry Hill, New Jersey.  Internal medicine and infectious diseases. Critical care and inpatient medicine.

1994-96: Medical Director, Total Care, Inc., Mt. Laurel, NJ. (Home intravenous infusion and respiratory therapy company)

1987-90: Intern and resident, internal medicine, Hospital of the University of

Pennsylvania, Philadelphia, Pennsylvania.

# Education

1983 -87 University of Pennsylvania School of Medicine: M.D.
1979 -83 Yale University: B.S, Biology, magna cum laude with distinction in biology.
1976-79: John F. Kennedy High School, Bellmore, NY
Edison Centennial of Light Scholar: Best male mathematics and science student in New York State, 1979
English and French Awards
Regent's Diploma
March of Dimes Award

# Hospital Appointments

Cooper Hospital, Camden, NJ
Riverfront Rehabilitation and Healthcare, Pennsauken, NJ
Majestic Center for Care and Rehabilitation, Camden, NJ
Abigail House, Camden, NJ

# Licensure

Active medical licenses in New Jersey and Pennsylvania
Federal and New Jersey DEA and CDS numbers
Florida Medical Expert License MEEW4453 – Expires 1/23/19

# Certification

American Board of Internal Medicine, 1990-2000, 2000-2010, 2010-2020, 2020-2030.



"Relevance reviewer," American Board of Internal Medicine - assist in development of internal medicine board certification examination. (2001 -2003).

Consultant to American Board of Internal Medicine for development of Practice Improvement Module used for board recertification (2010).

# Community Service

Yale Alumni Schools Committee, approximately 1997-1999

# Honors

Listed in **2003 Consumer's Guide to Top Doctors**
Listed in <u>**South Jersey Magazine's**</u> **Top Physicians of South Jersey 2005**
Listed in <u>**2004-2005 Guide to America's Top Physicians**</u> (Consumers' Research Council of America)
Listed in <u>**South Jersey Magazine's**</u> **Top Physicians of South Jersey 2009**
Listed in <u>**South Jersey Magazine's**</u>  **Reader's Choice Top Docs (Geriatrics) 2010**
Listed in <u>**South Jersey Magazine's**</u>  **Reader's Choice Top Docs (Internal Medicine) 2013**
Listed in <u>**New Jersey Magazine's Top Doctor List 2021**</u>

American Heart Association Certification: Basic Life Support for Healthcare Providers, CPR/AED 1/5/06-1/5/08.

# Invited Lectures

1. Garden State Paralegal Convention: "Evaluation of a Medical Negligence Claim," March 22, 2002
2. Chief Rounds, Cooper Hospital: Medical-legal Perils other than Malpractice." January, 2003
3. "Risperdal and Remeron: Raising the Standard of Care" sponsored by Janssen Pharmaceutica. March 12, 2003.
4. Chief Rounds, Cooper Hospital: "On Call Issues," March 6, 2006.
5. Chief Rounds, Cooper Hospital: "Nursing Home Issues," April 24, 2006.
6. Cooper River Convalescent Center: "Malpractice Issues in Nursing Homes," June 13, 2007.
7. "Communicating with Your Health Care Providers", Cherry Hill Hadassah Chapter, 2/13/08
8. "Medical Malpractice," Noon Resident Conference, Cooper University Medical Center 6/4/08.
9. ABCS of Diabetes - Patient Goals and Adherence to Therapy – Webinar for the New Jersey Academy of Family Physicians 3/8/17. Discussion of negotiating techniques to increase patient adherence with behavioral and pharmaceutical interventions to decrease smoking, decrease weight, decrease salt intake, and promote better blood sugar control.

# Publications

- Ziegler, MM, Kirby, J., McCarrick, JW3rd, Ikeda, CB, Dasher, J: Neuroblastoma and Nutritional Support: Influence on the Host-Tumor Relationship. Journal of Pediatric Surgery: 1986: March 21 (3) 236-9.
- New Jersey Academy of Family Practitioners: *The ABCs of Managing Diabetes Patients with Type 2 Diabetes: A Patient-Centered Approach QIE*. Panelist for

content development 10/1/16 – ongoing/in development.

- **Correlation of COVID-19 Mortality with Clinical Parameters in an Urban and Suburban Nursing Home Population**

  View ORCID Profile Richard S Kirby, John A Kirby
  **doi:** https://doi.org/10.1101/2020.10.15.20213629

- Your preprint 10.1101/2020.10.15.20213629 has posted on medRxiv:
  https://medrxiv.org/cgi/content/short/2020.10.15.20213629v1

- A portable graphical link to your paper (QR code) can be obtained here:
  https://connect.medrxiv.org/qr/2020.10.15.20213629. If the code is placed, for example, on a poster, your paper can be accessed through a mobile device's QR code reader

# Posters

- Kirby, R. and Kirby, J. *Correlation of COVID-19 Mortality with A1c, Blood Pressure and Other Clinical Parameters in a Nursing Home Population*. Poster accepted for presentation submitted to the Society of General Medicine November 2020.

Citizenship: United States

# CONFLICTS
**Albert Einstein Medical Center and affiliates - Philadelphia**
**Andover**
**Bloomsburg**
**Cinnaminson Center – Cinnaminson, NJ**
**Cooper Hospital – Camden, NJ**

**Jefferson Health System/Jefferson and Affiliates**
Abington Memorial Hospital
A.I DuPont Hospital for Children
Albert Einstein Medical Center
Jefferson Health Northeast (ARIA)
Bryn Mawr Hospital
Christiana Care Health System
Crozer-Keystone Health System
Excela Health Latrobe Hospital
Inspira Medical Center
Lankenau Medical Center
Methodist Hospital
Morristown Medical Center (Atlantic Health)

Overlook Medical Center (Atlantic Health)
Reading Hospital
Thomas Jefferson University Hospital
Virtua Health
Wilmington Veterans Affairs Medical Center
WellSpan York Hospital

**Mountain View**
**Riverfront Rehabilitation and Healthcare, Pennsauken, NJ**
**Majestic Center for Rehabilitation and Sub-Acute Care - Camden, NJ**
**The Palace Rehabilitation and Care Center, Maple Shade, NJ**
**Various Plaintiff's Firms**

**University of Missouri Hospital (Columbia, Missouri) and its affiliates**

**Available for Case Reviews whenever there is a need for expertise regarding the interface between medicine and law:**
**Plaintiff case triage**
**Plaintiff expert consultation**
**Defense expert consultation**
**Medical malpractice**
**Nursing home negligence**
**Contested wills**
**Competency evaluations**
**Criminal matters**
**Personal injury**
**Permanency evaluations**
**Medical research**
**Contested life insurance**
**Qui Tam actions**
**Medical professional licensing actions/investigations**
**Legal malpractice involving medical issues**

**<u>4 year Trial and deposition case list for John Kirby, MD: 12/18/17 – 12/17/21</u>**

**<u>Depositions (65)</u>**

**<u>2018 Depositions (19)</u>**
1/11/18 – Humphrey bob Mykisen – Attorney Koziol (Levin & Perconti) - Chicago - Fall with femur fracture – Causation and Damages expert.
1/17/18 – Rojas/Hughes – Attorney McMahon – Pressure Sore - NJ
1/18/18 – Hodges – Attorney Steele – Fall with femur fracture – Kansas City
2/8/18 – McFarlane – Attorney Urban – Pressure Sore – Wisconsin.
3/1/18 – Hodges – Attorney Steele – Fall – Kansas
3/15/18 – Batman obo Stout – Attorney Williams – Kansas City
4/19/18 – Ricupero – Attorney Devoto – NJ – Issue: Physician office practices in handling abnormal labs when physician is not in office.
4/25/15 – Horn – Attorney Campbell – Ohio – Fall
5/3/18 – Monzo – Attorney Bryant – NJ – ACL tear, knee OA, meniscus tear
5/29/18 – Bernardo – Wilkes & McHugh – fall with cervical spine fracture
6/7/18 – Thurston – Levin & Perconti – fall and pressure sore – Chicago
6/14/18 – Srock – Aronberg & Kouser – Pressure sore – Cherry Hill, NJ and Aribtration 9/25/18
6/26/18 – Reid – Marks (Ballette) – Competency to sign Arbitration Agreement – Georgia
8/27/18 – Panter – Attorney Levin & Perconti – Chicago – C. difficile, dehydration
9/27/18 – Curtis – Wilkes & McHugh – Las Vegas – Inadvertent Morphine overdose
11/2/18 – Chapman/Klecka – Levin & Perconti. Chicago – Failure to diagnose lung cancer.
11/5/18 – Haber – Attorney Fromer – NJ – Damages Expert – Bariatric Surgery complications
12/13/18 – Davison – Attorney Anglin – NJ – Retained foreign body
12/20/18 – Kilgore – Attorney Hamilton – KS – Fall with nasal fracture

**<u>2019 Depositions (5)</u>**
5/2/19 – Burks – Attorney Chaffee – MO – fall with patella tendon disruption –
6/13/19 – Crutchfield – Attorney Stark & Stark – pressure injury in ECF
7/18/19 – Capano - Attorney Talbot -  Pressure Sore, meatal erosion
8/6/19 – Kester – Attorney Javerbaum – Pressure Sore
12/5/9 - Collins – Elk & Elk – Ohio – Fall with Fractures

**<u>2020 Depositions (13)</u>**
1/28/20 Morales – Attorney Baxter - ? Camden County, NJ – Subdural hematoma

2/20/20 Randall – Attorney Galpern - ? Camden County, NJ – Fall with hip fracture
3/5/20 Angela – Attorney – Levin & Perconti – Chicago – Pressure Sore
5/7/20 O'Donnell – Attorney Rothenberg – NJ – Fall with hip fracture
6/12/20 – Madden – Attorney Oh – Arizona - Pressure injury
8/13/20 – Todd obo Ussery – Attorney Kevin Young – Missouri
9/25/20 – Vogel – Attorney Aaron berg – Ohio – Fall with femur and rib fractures
10/1/20 – Ignatowicz – Attorney Curnow – New Jersey – Femur fracture – causation and damages
10/8/20 – Pellegrini – Attorney B. Williams – Failure of ALF to provide correct code status to EMTs → delay in CPR, anoxic multiorgan failure - Missouri
10/8/20 – Kelly – Attorney Perlin – Capability of family to care for relative at home – Maryland
11/24/20 – Fincke – Attorney Steele – Injuries caused by Leg getting crushed in Hoyer lift and its attendant complications -  Kansas
12/17/20 – Shearer obo McMahon – Attorney Young – Missouri – Pressure Injury
12/28/20 – Finke – Attorney Steele – Kansas – leg hematoma and complications – causation and damages

**2021 Depositions (29)**
1/7/21 – Turner – Attorney Weinberg – C. difficile – NJ
1/19/21 – Smith obo Pitchford – Attorney Emerson – Pressure Injury – Chicago
1/21/21 – Turner – Beasley Allen – Pneumonia (ALF) – Georgia
2/18/21 – Penna/Gilligan – Attorney Schall – Pressure Injury – NJ
2/18/21 – Perry/Tyler – Attorney Young – Pressure Injury – Missouri
2/22/21 – Bosley - - Attorney Lockwood – Fall with Fractures – Maryland
2/23/21 – Martinez – Attorney Dratch – Distal biceps tendon Rupture – NY
3/23/21 – Weiss – Attorney Stark & Stark – Pressure Sore – NJ
4/27/21 – Smith – Attorney Mcgeady – Fall with hip fracture - NJ
5/20/21 – Quezada – Attorney Szaferman – Fall with ICH – NJ – 1 hour
5/25/21 – Kearney - Attorney Scher – Injured in prison – NJ
6/16/21 - Wright – Attorney Levin & Perconti – Mandibular fracture, pneumonia – Illinois
7/28/21 – Brown obo Robinson – Attorney Peterson - Pressure Injury
7/28/21 – Krivy – Attorney Soltis– Fall with Femur Fracture – NJ
8/25/21 – Leach – Attorney Brett Williams – Pressure Injury – Missouri
9/17/21 – Givens obo Shields – Attorney Kevin Young – Missouri- Pressure injury
9/23/21 –  D'Allesandro – Attorney Galpern – NJ – PTSD
10/12/21 – Veney – Attorney Rodriguez(Javerbaum) – Pressure Sore
10/14/21 – Ponaman – Attorney Oh – Pressure injury – AZ
10/15/21 – Merker – Attorney Ringold – NJ – PRESSURE INJURY
10/21/21 – Weers – Attorney Williams -  MO – fall with femur fracture
10/27/21 – Carey – Attorney Mariani – NJ – Pressure injury
10/28/21 – Baggett obo Vasquez – Attorney Mixan - IL – Femur fractures

11/4/21 – Burns – Allyon (Levin and Perconti) – IL – Pressure Injury
11/8/21 – Doyle – Attorney Green/Javerbaum – NJ – C. difficile – causation and damages
11/11/21 – Hill – Attorney Donlon/Kuhlman and Lucas – MO – Pressure Injury
11/30/21 – Zbranek – Attorney Green/Javerbaum – Fall with femur fracture – NJ – Causation and damages
12/13/21 – Johnson, Leroy obo Suson – B. Williams – Pressure injury – Causation and Damages – Missouri
12/17/21 – Conroy – Attorney Rossetti – Problems after cholecystectomy – NJ – Causation and damages

**2022 Depositions (1)**
1/12/22 – Wilbers – Attorney Brett Williams – Pressure Injury – Missouri
2/1/22 – Cholock – Attorney Jonathan Steele – Subdural hematoma – fall – Missouri
2/3/22 – Benson – Attorney Galpern – Exposure /frostbite – New Jersey

# Trials (14)

**2017 Trials (0)**

**2018 Trials (5)**
2/27/18 – Stadler – Attorney Bonjean – Camden NJ Federal Court – Dog bite
2/28/18 - - Concepcion-Reyes – Attorney Gibney – Atlantic City, NJ – Pressure Ulceration
3/15/18 – DeGeorge – Attorney Laughlin – Philadelphia Area – Subdural hematoma
9/17/18 – Morris – Attorney Grassi/Javerbaum – Cumberland County, NJ – Pressure Injuries
11/27/18 – Yaroch – Attorney Borbi – Burlington, NJ – Herniated disc (MVA)

**2019 Trials (3)**
2/19 – Stout/Batman – Attorney B. Williams – Wichita, KS
4/19 – Moody – Attorney Talbot – Camden, NJ – Diabetes
7/19 – Kilgore – Attorney Hamilton – Olathe Kansas – Nasal fracture

**2020 Trials (2)**
1/2020 – Groh – Attorney Levin & Perconti – Pressure Sore – Chicago
3/5/20 – De bene Esse Testimony – Flynn obo Hall – Fall with injury - Attorney B. Williams – Missouri

**2021 Trials (4)**

4/7/21 – Griffin – Attorney Dratch – NY – Pain and suffering – subarachnoid hemorrhage in Prison
4/13/21 (Arbitration) – Tavener – Attorney Ringold – Causation and damages – pressure Injury, Fall with traumatic injuries – NJ
12/2/21 – Vogel – Attorney Berg – Ohio – Fall – Causation and Damages.
12/8/21 – Merker – Attorney Ringold – NJ – Pressure Injury (Arbitration)

**John A. Kirby, MD**
**1964 Birchwood Park Drive North**
**Cherry Hill, NJ  08003**

## 2022 Fee Structure

$440.00 per hour for record review, preparation of reports, courtroom preparation time or other medical/legal services.

$500.00 per hour for depositions. (Minimum of 3 hours/$1,500.00). Payment from opposing counsel is requested at time of deposition. Deposition preparation is billed at $420.00/hour. In the event that expert deposition fees are reduced by court order, the client shall pay the difference between this reduced fee and the deposition fee listed above.

$3,000.00 per half day or part thereof for courtroom testimony ($6,000.00 for full day) --- based on time away from my clinical practice. Full day charged for out-of-town testimony. Trial testimony is to be pre-paid. Deposition preparation is billed at $420.00/hour if done on a day other than trial.

I also pass through any lodging, meal and transportation expenses to you for out-of-town depositions or testimony.

Travel Time to examine patients at nursing facilities or at his/her residence is billed at $210.00/hour.

**Cancellation fees** for deposition testimony:
2 days or less prior to scheduled testimony $500.00.
Cancellation on the day of Deposition--------$1000.00

**Cancellation fees** for courtroom testimony:
Less than 2 days prior to scheduled testimony $2,000.00.
3-7 days prior to scheduled testimony $1,000.00
8 or more days prior to scheduled testimony - No charge.

**Late fees** of 1% simple interest per month are assessed for payments beginning one month after initial invoice date.

All medical expert work is time-based. Consultation is not accepted on a contingency basis. Fees will neither be adjusted upward nor downward related to the outcome of a case.

Billing for patient visits at my office will be billed separately through Cooper Hospital per Cooper's prevailing fee schedule.

## **Retainer**: $2,500.00 or as negotiated

Transmission of records to John Kirby, M.D. for medical-legal review shall reflect understanding and acceptance of the above fee schedule.