Suzanne Frederick, MSN, RN-BC, CWCN
260 Settlers Creek Trail
Waco, Texas 76712

February 21, 2024

Jonathan Steele, Esquire
Steele Law Firm II, LLC
2345 Grand Boulevard, Suite 750
Kansas City, MO 64108

      **Re:**    **Laverne Somers**

Dear Mr. Steele,

The purpose of this report is to provide you with my nursing opinions regarding the care Laverne Somers received from South Pointe Rehab & Care Center, which was owned and operated by SP Healthcare Management, LLC (hereinafter referred to together as "South Pointe"). This report does not necessarily encompass all the details of my opinions but does give a fair summary of my opinions at this point. All of my opinions and conclusions stated in this report are based upon a reasonable degree of nursing certainty. I reserve the right to amend and add to my opinions upon further review of records.

As my attached CV describes, I am a Registered Nurse licensed in the State of Texas. I have been practicing as a registered nurse since 1983. I have a Bachelor of Science Degree in Nursing from the University of Mary Hardin Baylor and a Master of Science Degree in Nursing Administration from the University of Texas at Arlington. I received a Board Certification in Gerontological Nursing in 1997. I received a Certification in Wound Care from WOCN (Wound Ostomy and Continence Nurses Society) in 2007. I have worked as a Nurse Consultant to the United States Department of Justice regarding long term care issues including nursing standards of care, wound care and nursing administration. Through my education, experience and training, I am familiar with the standard of care for nursing homes including but not limited to all aspects of nursing administration as well as direct nursing care.

Since 2003, I have been a Clinical Nursing Instructor at McLennan Community College where I teach and supervise nursing students at the bedside regarding all aspects of nursing applicable to multiple settings including nursing homes and hospitals. This includes, in the least, proper direct nursing care, nursing assessment, care planning, documentation, supervision and assistance of residents similar to Ms. Somers. I have personally provided care to, and trained and supervised nurses and nurse aides in the care of residents similar to Ms. Somers. Through my experience, education and training, I am familiar with the nursing standards of care applicable in this case.

The medical records and information that I have reviewed and relied upon include the following:

- South Pointe Medical Records
- Resident Council Meeting Minutes
- MGM Policy and Procedures
- Lippincott Nursing Policy and Procedures
- In-Service Records
- DON Reports
- E-Mails
- Resident Council Meeting Minutes
- Defendant SP Healthcare Management LLC Responses To Plaintiffs' First Interrogatories
- Daily Staffing Sheets
- Facility License
- DOH Surveys
- Crystal Reports
- Midwest Geriatric Management, LLC Administrative Services and Consulting Agreement
- Deposition Transcripts:
  - Hopkins, Judith (MDS Coordinator)
  - Pierce, Janie (Interim Administrator)
  - Boucher, Lindsey (Administrator)
- Federal Regulations 42 CFR 483
- Oklahoma Regulations
- State Operations Manual (SOM), Appendix PP-Guidance to Surveyors for Long Term Care Facilities, Rev. 173, 11-22-17

Laverne Somers, 86 years old, was a resident of South Pointe since August 2016. This report focuses on the time period beginning around 2020. In 2020, her past medical history included dementia with behavioral disturbance, Vitamin B12 deficiency anemia, hypertension, depression, extrapyramidal and movement disorder, insomnia, anxiety, panic disorder, muscle wasting, generalized muscle weakness and lack of coordination.

Ms. Somers had moderately impaired cognitive skills for daily decision making and required supervision. She required assistance with activities of daily living (ADLs). She also required 24 hours supervision by the staff to keep her safe. Ms. Somers had a history of falling while at South Pointe. Her medical records showed that she experienced falls in March and April 2020. She was able to ambulate but required supervision and was noted to overestimate or forget her limits. Ms. Somers was assessed as being at High Risk for falls.

After reviewing Ms. Somers' medical records and facility documents as listed above, it is my opinion to a reasonable degree of professional nursing certainty that South Pointe breached the standard of care as well as federal and state nursing home regulations in their treatment of Ms. Somers which caused her severe harm. During her residency at South Pointe in 2020, as a result of substandard nursing care, Ms. Somers suffered seven preventable falls from 07/01/20 to 10/22/20. The last fall resulted in a rupture of her right orbital globe which required ocular surgery at Integris Hospital. The records show that the nursing staff failed to provide care and services to Ms. Somers to keep her safe and meet her needs. Ms. Somers died at South Point on 10/26/20.

The following paragraphs include a summary of events as well as the standard of care applicable to South Pointe and ways in which they breached the standard of care as well as nursing home regulations for Ms. Somers.

Lindsey Boucher, an Administrator of South Pointe testified that the federal regulations and state regulations are in place to ensure resident safety.

Federal nursing home regulation § 483.24 Quality of Life states, "Quality of life is a fundamental principle that applies to all care and services provided to facility residents. Each resident must receive, and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with the resident's comprehensive assessment and plan of care."

Federal nursing home regulations and the standard of care required South Pointe to ensure that the resident environment remained as free of accident hazards as is possible and each resident received adequate supervision and assistance devices to prevent accidents (42 CFR §483.25(d)(1)(2)).

Per the State Operations Manual (SOM), Appendix PP-Guidance to Surveyors for Long Term Care Facilities, Rev. 173, 11-22-17 and the standard of care, South Pointe was required to:

- Identify hazard(s) and risk(s);
- Evaluate and analyze hazard(s) and risk(s);
- Implement interventions to reduce hazard(s) and risk(s); and
- Monitor for effectiveness and modify interventions when necessary.

Per the State Operations Manual (SOM), Appendix PP-Guidance to Surveyors for Long Term Care Facilities, Rev. 173, 11-22-17 and the standard of care, if South Pointe fails to do any of these things the fall was preventable or avoidable.

Federal nursing home regulation, 42CFR §483.21 Comprehensive Person-Centered Care Planning and the standard of care required South Pointe to develop and implement a baseline care plan and a comprehensive care plan for Ms. Somers that included the instructions needed to provide effective and person-centered care of  Ms. Somers that meet professional standards of quality care.

Deviations of the standard of care related to care planning cause falls because the care plan is a communication tool the nursing staff uses to ensure appropriate interventions are implemented to prevent certain things like falls. The care plan is not just paperwork. If the care plan fails to include all the appropriate fall related interventions, then the nursing staff does not know what interventions to look for and ensure are in place for a resident. The written care plan ensures nursing staff know what interventions must be in place to prevent falls. A deficient care plan causes falls because the nursing staff doesn't know what interventions need to be implemented day to day and shift to shift.

Federal nursing home regulation, §483.70(i) Medical records, and the standard of care required South Pointe to maintain medical records on Ms. Somers that were complete, accurately documented, readily accessible, and systematically organized.

Federal nursing home regulation, 42CFR §483.35—Nursing Services, states, "The facility must have sufficient nursing staff with the appropriate competencies and skills sets to provide nursing and related services to assure resident safety and attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care and considering the number, acuity and diagnoses of the facility's resident population in accordance with the facility assessment required at §483.70(e)." [Appendix PP—Guidance to Surveyors for Long Term Care Facilities, Rev. 173, 11-22-17].

According to the Centers for Medicare and Medicaid Services (CMS), "there is considerable evidence of a relationship between nursing home staffing levels and resident outcomes. The CMS Staffing Study found a clear association between nursing staffing ratios and nursing home quality of care, identifying specific ratios of staff to residents below which residents are at substantially higher risk of quality problems." (CMS Design for Nursing Home Compare Five-Star Quality Rating System, Technical Users' Guide, February 2015.)

South Pointe's nursing staff knew or should have known that Ms. Somers was a high risk for falls. She had moderately impaired cognitive skills for daily decision making and required supervision. She was wheelchair bound and could not walk due to increased weakness. She was noted to overestimate or forget her limits and would attempt to get up on her own. Ms. Somers had a history of falling while at South Pointe. Her medical records showed that she experienced falls in March and April 2020. The nurses repeatedly documented fall risk assessments that showed Ms. Somers as being at high risk for falls.

On 07/01/20, Ms. Somers suffered an unwitnessed fall. La'Shauntae Kemp, LPN's nurse's note at 2043 that stated the following:

> This nurse was called to room 125. This resident was observed sitting on her bottom on the floor. A full assessment was done. No injuries or bruises at this time. Denied having any pain at this time. ROM x4. Resident was helped into her bed. Neuros were started. Notified son Andy Chaballa, physician, and nurse on call. VS BP 156/79 P 84 R 18 T 98.2

The Change in Condition Evaluation did not offer any additional information. A Fall Scale-Morse completed by LPN Kemp showed that Ms. Somers was High Risk For Falling with a score of 55. LPN Kemp noted under Mental status – "overestimates or forgets limits." Kemp also marked her gait as "Normal/bedrest/wheelchair." The assessment form states that a score $\geq$ 51 reflects High Risk and the required action is to implement High Risk Fall Prevention Interventions.

On 7/7/20 at 1505, LaTasha Day, FNP entered a late entry nurses note for 7/6/20 at 1310. This was a subsequent visit due to Ms. Somers' fall. FNP Day noted that Ms. Somers was "found sitting in the floor in her room beside her bed. She is confused and does not know what she was trying to do. She is w/c bound and forgets she cannot walk due to increased weakness. She denies pain or injury…confused…cooperative, good eye contact, only has right eye.. Problem: Resident was found in her room sitting on her bottom in the floor. She is confused and forgets she cannot walk on her own, unknown if she hit her head, she does not know what happened. She has a history of falls. She denies pain. No injury on exam, able to move all extremities with no issue. Plan: Neuro checks Q shift. Fall precautions. Educate resident on asking for assistance when needed, using call light, Monitor vitals.

FNP Day's written note that Ms. Somers "is confused and does not know what she was trying to do. She is w/c bound and forgets she cannot walk due to increased weakness" should have been placed on Ms. Somers fall prevention care plan but it wasn't. This is the type of information the CNAs and staff nurses needed to consider in order to prevent her from falling.

On 7/13/20 (late entry effective 7/10/20), Carleesha Moore, Director of Nursing Services entered a Restorative Progress Note that reflected a plan for Ms. Somers to participate in three times a week that included restorative ambulation with a walker and stand by assist. The goal was to maintain bilateral lower extremity range of motion and strength and maintain walking ability.

Ms. Somers suffered another unwitnessed fall on 07/17/20 and was seriously injured. Cynthia Stucks documented on 07/17/20 at 1113 the following "Incident Note,"

Resident told this nurse that her head hurts and also her neck. States she fell out of bed earlier today does not recall the time. Unable to move her head back and forth. Xray of C-spine ordered at this time and Tylenol 650mh given. Dr. Coopers office notified and informed them of need to x-ray and they said to do what I needed to do. They will inform Dr. Cooper of this. Towel placed carefully under residents neck. Neuro checks started due to the fact resident states she hit her head when she fell.

The Change in Condition form was completed by Lila Chatman, LPN at 1251 on 07/17/20 and notes "injury fall out of bed, hit back of head, XRAY. Recommendations: X-Ray To Cervical Spine."  The x-ray was negative.

Two Fall Scale- Morse assessments were completed by two separate nurses for 07/17/20. The first was completed by Lila Chatman, LPN (signed 07/17/20). The score was 65 (High Risk For Falling) and notes gait as weak. The second was completed by Cynthia Stucks, RN (documented as effective 07/17/20, but not actually signed until 07/24/20). The score was 55 (High Risk For Falling) and notes GAIT as normal. In contrast, on 07/19/20, Ms. Somers was noted to have an unsteady gait.

Lila Chatman, LPN documented at 1251 on 07/17/20:

> Note Text: Focused charting related to injury fall - resident report to nursing staff she fell last night out of bed and hit the back of her head. "stated she didn't report it because she was not hurting during the time". resident currently lyng in a supine position and unable to turn head left to right due to pain. head to toe assessment complete. speech clear and resident Is able to verbalize concern.no bruising, skin tears, no abrasions unable to turn head left to right. no skin breakdowns. Dr. Drew Cooper notified. neuro checks started; skid strips applied on floor; received new order for X-RAY Cervical spine due to c/o fall; alert and oriented x3, breathing pattern regular/unlabored/ c/o injury fall out to bed, hit her head on floor and is currently has a headache. Prn Tylenol 325mg administer po. 175/89-82-19-96% on room air. Floor mate applied at this time. family notified.

Cynthia Stucks created another "Incident Note" on 07/24/20 at 11:32 but entered an Effective Date of 07/17/20 at 11:29 which stated,

LATE ENTRY

Note Text : Met with IDT on residents fall. Resident does not ambulate, resident told this nurse that she fell sometime during early morning hours. This nurse asked resident how she got back into bed and resident told this nurse that someone helped her back into bed. C/o pain to back of head and neck. IR done and xray called for a C-spine xray. Dr. Cooper called and left message. Son called also.

For someone to help Ms. Somers back into bed after she fell and not informing the nurse about what happened was a breach of the standard of care and placed her at great risk of harm. The records provided do not reflect the fact that this issue received proper follow up investigation.

Cynthia Stucks wrote several LATE ENTRYs. One was on 07/24/20 at 11:32  with an Effective Date of 07/20/20 at 11:36 which stated, "Met with IDT on how we can prevent falls on this resident. Bed in low position fall mat, toilet AC and HS, frequent checks. Resident still c/o headache and neck pain." However, the care plan was not updated to reflect interventions of applying skid strips on the floor, toileting her AC and HS, or implementing frequent checks. The failure to properly update her fall prevention care plan in a timely manner after this fall was a breach of the standard of care.

Following this fall, Ms. Somers' blood pressure remained elevated for much longer than 24 hours and was subsequently placed on Clonidine as needed. She continued to complain of neck pain and headaches and on 7/21/20 was vomiting. She was transferred to Southwest Medical Center due to "falling last week and hitting her head and is now having increased BP, headaches and emesis." She was diagnosed with a cervical (C2) spine fracture at the hospital. She was placed in a Miami J neck brace. She returned to South Pointe around 0300 on 07/22/20 and was placed on the Transitional Hall 400. Orders included the Miami J brace on at all times and follow-up with ortho in one week.

On 7/26/20, Carleesha Moore, DON wrote a nurse's note summarizing Ms. Somers condition and the fall events. Her note finally stated,

An environmental check was done, and her room has been rearranged for safety. The facility has implemented a concave mattress to increase boundary awareness when resident is in bed. The residents bed is being maintained in the lowest position with a safety mat on the side. The staff who are in her care has been educated on her safety interventions. The family has been updated and verbalized satisfaction with the interventions that have been implemented. This will be our final report.

Environmental Check and Room Rearranged for Safety
Concave Mattress
Pain is Effectively Managed
Calcium-Vit D 600-400mg BID Ordered
Low Bed With Safety Mat
Miami J Collar with F/U with Ortho
Staff Educated on Safety Interventions

On 08/3/20, a Fall care plan was revised by Oluwabunmi Olibamoyo, LPN &/or Caleb Onwuka (MDS Coordinator). The Focus was "FALLS STATUS: I am at risk for falls r/t psychotropic medication use. She is up ad lib throughout the facility without using any assistive devices." The Interventions listed on this care plan do not clearly reflect when they were added to the Fall care plan but include the following:

- The resident needs a safe environment with: (Specify: even floors free from spills and/or clutter; adequate, glare-free light; a working and reachable call light, the bed in low position at night; Slide fails as ordered, handrails on walls, personal items within reach)

- 03/11/19 - resident report of fall - swollen ankle (x ray negative)- encourage resident to report falls

- 03/26/20 - fall with bruise o right to allow staff to put shoes on right feet knee. Encourage Laverne

- 3/2/10 - fall with c/o knee pain - ice to knee, NP assessment – enc rest periods

- 3/30/20 non injury fall- PT/OT to eval

- Anticipate and meet my needs

- o Be sure my call light is within reach and encourage me to use it for assistance as needed.

- o Encourage me to participate in activities that promote exercise, physical activity for strengthening and improved mobility.

- o Ensure that I am wearing appropriate footwear when ambulating.

- o Ensure that the floor in my room is free from clutter and possible hazards

- o Fall 4/13/20-X-ray ordered and negative. Seen by nurse practitioner. Staff education.

- o Fall 5/23/20: Toilet between meals and at HS as resident allows. Resident was seen by APRN.

- o Fall on 7/1/20: Seen by the APRN. Bed in lowest position with safety mat. Restorative as ordered.

- o Fall on 7/17/20: Environmental check. Room rearranged for safety.

- o Bed in lowest position with safety mat on the side. Concave mattress. Seen by APRN.

- o Resident has complained of falls that are not witnessed. She reports "falls" 2-3 day after. Staff to monitor for falls.

- o SBAR per facility protocol.

- o Staff to monitor for adverse side effects of medications and report abnormals to MD.

- o Follow fall assessment per facility protocol.

The items for "safe environment" were not specified on the care plan. The fact that Ms. Somers did not have the cognitive ability to reliably use the call light was also not on the Fall care plan. Instead, the intervention of "Be sure my call light is within reach and encourage me to use it for assistance as needed" remained on her care plan which was misleading. Even though some prior falls were noted on her care plan, the way she fell was not. The staff should have been made aware of how her previous falls occurred so they would make an effort to prevent similar occurrences.

On 07/28/20, Gakara Hooks, LPN documented,

> Nurse noted resident has had decline in health since recent fall. Resident requires assistance x1 with ADL's and transfers. Resident remains in bed quiet shift. Resident refuses to wear collar as ordered. Staff continues to encourage and reapply collar as much as resident will let staff. Resident has poor appetite.no s/s of acute pain or discomfort noted at this time. Nurse notified SS of resident's decline and requested care plan meeting as soon as possible. Nurse notified MD as well of resident decline. bed in lowest potion with staff anticipating needs. call light within reach.

On 08/3/20, LaTasha Day, NP noted that the nursing staff reported that resident has been declining since she had her fall and was moved to another hall in the facility. She has been more confused, wandering in other resident's rooms, and has been refusing to help with transfers and assists. Resident is oriented to self and is not aware of situation... has had increased confusion and agitation. She has been wandering in other resident's rooms and she is w/c bound and not helping in transfers anymore. She states her head and neck hurts and frequently takes off her neck brace.

Plan: 2 person assist with transfers

Monitor behaviors, report abnormal

Monitor for change in condition

Encourage resident to wear neck collar as tolerated

On 08/24/20, Ms. Somers had another fall when she was left in her wheelchair in her room unattended. At 1345, Lambe, LPN noted,

responded immediately to a call from resident's room and observed her lying on the floor on her right side in front of her wheelchair which had tipped over to the side. A head to toe assessment was completed and no apparent injuries observed. Neuro checks initiated immediately. Resident confused and has been into other residents rooms. staff has been redirecting her throughout the shift. Resident was able to move all extremities without c/o pain. With the assistance of 2 staff, she was assisted into her bed. Neuro checks initiated immediately. Dr Cooper and Andy notified. On call nurse and unit manager also notified. Resident will not be left in her wheelchair in her room unattended. vs bp-108/57, p-101, r-20, t-97.7, o2 sats 97% RA.

Based on Ms. Somers documented confusion and recent falls, it was clearly a breach of the standard of care to leave her in wheelchair in her room unattended. This evidenced the lack of supervision and training of the direct care staff.

A Fall Scale – Morse assessment was completed by Lambe, LPN with a score of 75, High Risk For Falls. Her gait was noted as impaired.

On 08/24/20 at 1646, the Social Worker noted that she was notified that resident was wandering in and out of others' rooms. SSA was notified that resident will be moving back to hall 100. SSA notified resident son and resident.

On 08/27/20, Ms. Somers suffered another fall. Carol Henderson, LPN documented at 1841,

Resident continues on neuro checks for a unwitnessed fall. No s/s of injury or pain. VS 117/81, 98.3, 86, 18 with normal neuro checks. She recently moved back to hall 100 where she was reported as to having transferred herself out of w/c into bed. This evening, she stood for the CNA and then she dropped to her knees and fell landing with her top half of her body on the bed. Resident would not try to stand up so that we could properly place her in the bed. 2 people had to scoot her top half over and then pull her legs up into bed. Resident then refused to assist CNA with rolling when she was being changed into night clothes and new brief.

This event was not reported or evaluated as a fall. The nurses did not complete a Fall Scale – Morse assessment per the standard of care. The records also did not reflect that the physician and family were notified or that follow up assessments were done. The failure to treat this as a fall was a breach of the standard of care.

On or around 09/03/20, Ms. Somers tested positive for Covid. She was placed in isolation on droplet precautions and was moved from room 125-B to room 101-A. LaTasha Day, NP visited her on 09/04/20 and noted that Ms. Somers was having fatigue, weakness, decreased appetite, and malaise. She denied pain with breathing, denied abdominal pain, currently no SOB or cough. Vitals were noted as stable.

On 09/05/20, LaTasha Day, NP visited and noted that Ms. Somers was very weak, had to have 2 person assist, and not wanting to eat much. She had a mild cough, but mostly wanted to rest in her bed.

The 9/10/20 MDS reflected that Ms. Somers was suffering from some delusions. She had wandering behavior one to three days in the past seven days. She required extensive assistance by two people with bed mobility and transfers.  She was frequently incontinent of urine and bowel. The MDS stated she had No rejection of care  and no condition or chronic disease that would result in a life expectancy of less than six months. Per the MDS, she had two falls since the last re-entry period:··one fall with no injury and one fall with injury.

On 09/12/20 at 07:30, Khari Gadlin, LPN noted that Ms. Somers was

> very drowsy and pale. V/S96.1,78,18,69/49,85% on 2L.Dr. Cooper on-call notified and received new orders to send out to ER for eval. 911 called at 7:45 and EMSA and fire department arrived at 7:50. Resident transported via stretcher with current list of medication, face sheet, bed-hold policy to Southwest ER for eval. Family ( Andy Chaballa) son called and notified of new orders. Manager on-call notified of new orders. Resident has no facial grimacing or discomfort.

Ms. Somers returned to the facility around noon on 09/12/20. On 09/14/20, LaTasha Day, NP noted that she has been eating about 50% of meals. She is confused and does not know why she feels bad. She is w/c bound. She still has a mild cough and SOB. Vitals are currently stable. Plan: Apply oxygen 2L NC if O2 <90%.

On 10/4/20, a nurse noted that her appetite remains poor, continues to refuse to eat any food and she continues to smear poop all over her blankets and sheets and remove her brief.

On 10/6/20, a care plan meeting was held. The notes stated that she remained in the  secured unit. Millennium Medical Services continued to follow her for psychiatric treatment.

On 10/10/20, she was noted to have a right eye infection. The NP was doing rounds and noted her right eye was redder today than yesterday. New orders were given for Polymyxin to infected eye TID x 7days; order faxed. The NP noted Ms. Somers was seen for poor appetite and discharge from right eye. Ms. Somers  complained of  irritation in right eye. The NP noted she already had low vision in that eye, and her left eye was missing. Duration x 2 days. Conjunctivitis in right eye.

On 10/12/20, the NP noted that Ms. Somers had been refusing to eat meals x 2 days. Ms. Somers stated she did not feel like eating anything and she did drink her magic cup. Her right eye was erythematous with purulent drainage. Labs were ordered, but she refused several times. Plan: Nutrition consult, discuss with Dr. Cooper, encourage snacks.

On 10/13/20, Polymyxin eye drops were not administered for the 0800 dose and the nurse failed to document the reason for the omission. The nurses notes stated that Ms. Somers refused to eat meals or snacks. Dr. Cooper was notified, labs ordered. Remeron 7.5mg QHS ordered. The nurse attempted to straight cath for urine, "zero result."

On 10/14/20, the LaTasha Day, FNP noted she was seeing Ms. Somers for behavioral change. Nurse reports resident has been running into things with her w/c, mumbling, and seems a little more confused than normal. She has been recovering from covid 19 and has had a slight decline. She is confused and not aware of clinical situation. Nurse reports she has been smearing feces all over her room and refuses to let anyone clean her. CBC, CMP, UA ordered.

On 10/15/20, Ms. Somers fell again. At 0911, a nurse noted that Ms. Somers was seen by Amy Greco with Millennium Services. A new order was received to discontinue Trazodone. At 1257, the nurse noted Ms. Somers was seen by a PA and orders were received for Doxycycline 100 mg BID x7 days and probiotic x7 days.

Carol Henderson, LPN noted that at approximately 2030, she heard resident yelling out for help and found her lying on the floor between the ends of the beds in her room, head was at the wall. Resident reports she fell out of bed. Bruising was noted to the outer lower portion of bilateral buttocks. Doctor and family were notified, no new orders. Intervention is to place a fall mat beside the bed. Neuro checks initiated.

Although Doxycycline 100 mg BID was ordered on 10/15/20 for 7 days, the MAR showed that Doxycycline was not started until 05/19/20. The nurses failed to notify the physician that this medication was not started when it was ordered, which was a breach of the standard of care. The facility failed to have an effective system to ensure that medications were available timely and were administered as ordered by the physician. These failures contributed to the worsening of Ms. Somers' eye infection as well as her pain and discomfort.

On 10/16/20, a nurse's note at 1246 stated that a CMA notified this nurse that Ms. Somers' Doxycycline 100mg was not there. Placed called to pharmacy and refaxed order at this time.

On 10/18/20 at 1301, a nurse noted that Doxycycline was not available to be given. The pharmacy was notified and reports it will be out in next round.

On 10/19/20 at 0918, La'Shauntae Kemp, LPN noted she faxed order for Doxycycline 100 mg on 10/15 and 10/16. CMA notified this nurse that this residents Doxycycline 100mg was not in. This nurse called pharmacy and pharmacy tech stated they didn't receive an order. This nurse went to another hall and refaxed order at this time and received a successful confirmation. Called pharmacy back and was told they received the order and they would STAT the medication to us. Will administer as soon as medication arrives.

Ms. Somers fell around 1645 on 10/19/20. Carol Henderson, LPN noted that,

> At approximately 1645 this evening we heard a loud thud in the dining room and CNA assigned to dining room reported that resident had attempted to stand up from her w/c and fell to the floor. When I arrived on the scene I observed resident lying on her left side up against the wall. Resident VS 132/74, 18, 86, 97.5, no open areas were noted, there was redness and bruising starting on the top of her left trochanter. She flinched when palpated but had normal ROM in her left leg. Eyes PEARL, grips were even, ROM was WNL of her baseline. Resident showed no s/s of pain or discomfort. She had been attempting to stand up several times prior to this

fall but staff had caught her before she fell. Dr. Cooper's on call was notified and no new orders were given. Her son, Andy Chaballa was contacted and informed of the fall and of our intervention of keeping her in a common area where staff can monitor her while she is up in chair. Neuro Checks will be started.

On 10/22/20, Ms. Somers fell again in the dining room. La'Shauntae Kemp, LPN noted at 1257,

> This nurse was called to dining area. This resident was observed on the floor laying on her left side near her w/c. Resident c/o pain to her right eye and was bleeding from her right eye. A full assessment was done. Resident was able to move all extremities x4 without difficulty. Resident continues to have a bruise to her left hip from a fall she had on 10/19. Resident was helped into her w/c. Notified physician and received orders to send resident to SW medical Center. Notified son Andy Chaballa. VS BP 128/68 P 89 R 18 t 97.6

South Pointe was required to provide sufficient staff in the dining room in order to keep residents like Ms. Somers safe. The fact that she was allowed to fall a second time in three days was reckless. The CNAs assigned to the dining room should have been informed about Ms. Somers' particular risk factors for falling including her cognitive limitations and her history of trying to get up on her own. The CNAs assigned to the dining room should have closely supervised Ms. Somers and should have been in close enough proximity to keep her from standing up on her own out of the chair. The failure to do these things was a breach of the standard of care and proximately caused her falls and related injuries as the additional staff would have more than likely been able to intervene and prevent the fall.

Ms. Somers was transferred to SW Medical Center. She was found to have a rupture of right orbital globe which required ocular surgery. She spent the night at Integris Hospital for observation following surgery and returned to the facility the following day.

A Fall Scale-Morse was completed by La'Shauntae Kemp, LPN with a score of 55. Kemp noted Ms. Somers had a normal gait which was inaccurate.

On 10/23/20 at 2151, LeeAnn Boone, LPN noted that Ms. Somers returned to the facility and was admitted to room 605 under the care of Dr. Cooper. Boone noted she spent one night at Integris Southwest for surgery to eye related to ruptured globe of right eye. She was oriented to self only. She was incontinent of bowel and bladder, pericare provided. She had a large bruise to the left hip. Small open areas were noted to both right and left buttock. She had a bruise to the left forearm and her right eye was red. Her Braden Score was 11, indicating she was at high risk for developing pressure injuries. Her Fall Scale-Morse score was 75 and her gait was noted to be impaired.

On 10/24/20, two late entry nursing notes were entered for this date, at 1405 and at 1611. Both of these nursing notes paint picture of a resident with normal vital signs and in no apparent distress. However, both of these nursing notes are late entries, created on 10/27/2020 at 1608 and 1611 by Magdaline Abwekoh, LPN but effective for 10/24/20. Abwekoh did the same for a note the following day. These notes reflect an attempt to reflect proper assessment and documentation after the resident has already died.

Magdaline Abwekoh, LPN  entered a note effective 10/25/20 at 1611 which was created on 10/27/20 at 1614. The  noted stated that Ms. Somers was assisted on her wheelchair for meals resident was assisted with feeding she went right back to bed after meals. Breathing even and unlabored, lungs sound clear. left eye no sign of drainage or infection. incontinent care provided. Vs 120/69, 74, 97.2, 18, 96%ra. resting in bed with no sign of pain or discomfort. call light within reach. continue to monitor. The MAR reflected that Ms. Somers refused both of her dosed of Doxycycline which were due at 0800 and 1700. This which was not mentioned by LPN Abwekoh in her note that was written two days after the effective date.

Patrick Kongue, LPN entered a note effective 10/26/20 at 0852 which was created two days later on 10/28/2020 at 0907. Kongue noted a head to toe assessment conducted on this pt as she was newly admitted to this unit. The note reflected that Ms. Somers was able to make needs known, ate 25% of breakfast and lunch. Bruises noted on her left hip and her right lower arm. Buttock looks clear no redness or excoriation noted at this time. BP:126/72, R20, O2:96 RA, PAIN UTA pt will not rate her pain but isn't showing sign of discomfort.
There was a pattern these last few days of nurses going back and documenting notes and assessments after Ms. Somers has died which was a breach of the standard of care.

LeeAnn Boone, LPN created a nurse's note at 2305, effective 2204, which stated Boone entered the room around 1630 and administered this resident's 1600 medications. At this time resident was alert, able to sit on the side of the bed and took medications without complications.

Resident laid back down after taking meds. Boone noted she reentered room around 1730 with resident dinner tray - resident was alert, sat up on side of the bed and began feeding self dinner/meal. "CNA checked on resident halfway through meal, resident still seating on side of bed eating." CNA returned for dinner tray and noticed resident lying flat across bed with no respirations. CNA yelled for nurse, nurse (Boone) came to room and note no pulse, no respirations. "This nurse ran to check residents code status. Resident full code, this nurse pulled resident to floor and started CPR. CNA ran outside hallway and yelled code blue 600. Nurse from 300 hall came to assist this nurse with CPR, 30 chest compressions 2 rescue breaths by ambo bag. This nurse contacted 911 via cellphone requesting ambulance to location. Yelled for CNA to go back to hall and find another nurse as needed break from compressions. Dr. Raju NP happened to be in hallway. NP felt for pulse, listened for heartbeat and called TOD at 1823.

LPN Boone's note reflected a lack of adequate systems and training related to Code Blue situations. For example, instead of pulling Ms. Somers to the floor, why didn't the staff have a backboard close by that could have been used. Was there no alarm system in place for codes, instead of the CNA having to run into the hallway to yell out Code Blue? 911 was called by the nurse who was doing compressions during the code. The same LPN had to yell out for the CNA to go find another nurse to come help for break from compressions.

South Pointe breached the standard of care in numerous ways in regard to Ms. Somers. It is my opinion that these failures South reflected insufficient staffing in numbers, proper mix, competency, training, supervision or a combination of all three. Ms. Somers repeatedly experienced falls because she was left unattended either in her wheelchair in her room or in the dining room, which reflected insufficient staff that could and would have provided adequate supervision and more likely than not prevented these falls.

South Pointe failed to have an effective fall prevention system. As described in this report, South Pointe and its nurses failed to create and implement an individualized comprehensive fall prevention care plan for Ms. Somers. The failure to properly care plan proximately caused Ms. Somers to experience avoidable falls. As described above, deviations of the standard of care related to care planning cause falls because the care plan is a communication tool nursing staff use to ensure appropriate interventions are implemented to prevents certain things like falls. The care plan is not just paperwork.  If care plan fails to include all the appropriate fall related interventions, then nursing staff do not know what interventions to look for and ensure are in place for a resident.   The written care plan ensures nursing staff know what interventions must be in place to prevent falls.  A deficient care plan causes falls because nursing staff don't know what interventions need to be implemented day to day and shift to shift.

A review of the e-mails in February 2020 showed that Kim Selvey, DON recognized that South Pointe had too many falls. Selvey wrote in an email that the facility "needed to start educating on falls and that prevention is key. We need to decrease our falls and it will take an army."

South Point nurses breached the standard of care by failing to document timely and accurately. Administrator Boucher testified that one of the purposes of having accurate charting was so that the nursing staff could understand the needs of the residents when they come on duty. But the nurses repeatedly created late entries days later, even days after Ms. Somers had died. Such late entries bring the veracity of any documentation into question. The nurses also documented conflicting information about Ms. Somers condition as noted in this report.

South Pointe had a turnover of DONs and Administrators during the end of 2019 and into 2020. Lindsey Boucher was the facility Administrator from October 2019 through spring 2020. She reported to Melissa Bettis, Regional Director of Operations for MGM Healthcare. Boucher testified that MGM Healthcare made the budget for the facility, including the budget for staffing. South Point staffed to meet the state minimums and Boucher did not recall instances where they went over the minimums. Emails reflected close scrutiny of payroll variances by the corporate office. Bettis sent an email regarding starting out the year 2020 which referred to a Medicaid increase in Oklahoma. Bettis stated, "we must fill our Medicaid beds. We should have a skilled census at or above budget, and we really need to push to fill the Medicaid beds to maximum occupancy."

At the same time, the facility was dealing with open positions and having to rely on agency staff and overtime to meet the staffing needs. A review of the labor reports showed that the facility did not have enough RNs. The facility violated federal regulations at times by failing to have an RN in the building for eight consecutive hours every day. E-mails reflected significantly poor staffing on the weekends.

Insufficient staffing was reflected in the Resident Council Meeting minutes. For example, minutes from the September 2019 meeting showed that residents reported the staff were turning call lights off and not checking what the resident wants or stating that they would get someone but then not getting someone. Fourteen residents shared that concern.

In October 2019, there were complaints that residents were not being checked every two hours. At times, staff would ignore residents and leave them in the dining room for long hours at a time.

In November 2019, the residents still complained of not being checked every two hours and not receiving assistance to get out of bed for mealtimes. Staff were listening to music in the halls and in the shower, and not taking out trash. Residents complained of staff walking in,  turning off the call light, leaving, and never coming back. Staff were sleeping at the nurses' station, and call lights were going off.

In December 2019, the staff sleeping at the nurses' station, and call lights going off was still a problem. In January 2020, residents complained they were not being changed in a timely manner. CNAs were sleeping in the halls and lights were not being answered. Residents complained of not getting showers and not getting meal trays.

To a reasonable degree of nursing certainty, and as detailed in this report, South Pointe and its' nursing staff demonstrated a pattern of failing to comply with the standard of care as well as professional nursing practice standards. It is my opinion that the pattern of substandard care of Ms. Somers reflected insufficient staffing either in numbers, proper mix, competency, training, supervision or a combination of all three. Their failures to meet the standard of care proximately caused Ms. Somers' falls.

The deviations of the standard of care described above also constitute a conscious disregard for the safety of Ms. Somers because South Pointe knew or should have known failing to adequately staff the facility and adequately supervise Ms. Somers would likely result in injury to Ms. Somers and others.

Respectfully submitted,

*Suzanne Frederick, MSN,RN-BC, CWCN*

Suzanne Frederick, MSN, RN-BC, CWCN

**SUZANNE FREDERICK, MSN, RN-BC, CWCN**
**260 Settlers Creek Trail**
**Waco, Texas 76712**
**(254) 715-8812**
**suzanne@frederickrn.com**

**EDUCATION**

Master of Nursing Administration
University of Texas at Arlington.  Arlington, Texas.
Graduation Date: May 1996.

Bachelor of Science in Nursing.
University of Mary Hardin- Baylor.  Belton, Texas.
Graduation Date:  May 1983.

Certified Wound Care Nurse
Wound Scope Program and Certification
Wound, Ostomy, Continence Nurses Society: 2007

**LICENSURE**

Registered Nurse - Licensure in Texas since 1983
Multi-State Compact RN License

**CERTIFICATIONS**

Certified Wound Care Nurse, WOCN
Board Certified Gerontological Nurse
CCRN - Certified Critical Care Registered Nurse 1987-1994
ACLS - Advanced Cardiac Life Support – Provider**;** Past
Instructor  PALS - Pediatric Advanced Life Support - Past
Instructor
TNCC - Trauma Nursing Core Course

**EXPERIENCE**

2003 - Present

**Clinical Nursing Instructor - McLennan Community College**

Clinical nursing practice in long term care and acute care teaching nursing students all aspects of nursing care including assessment, care-planning, wound care, documentation, clinical skills, communication, and critical thinking.

2003 - 2005

**Clinical Nursing Instructor – University of Texas at Arlington**

Taught Nursing Administration classes at Graduate Level

1999 - Present

**Nursing Consultant – United States Department of Justice**

Provide consultation and follow up to assist the facilities in  making improvements.

1996 - 2004

**Nursing Supervisor - Hillcrest Baptist Medical Center, Waco, Texas**

1

House Supervisor entire hospital evening, nights and weekends; supervised Code Blue Team, Trauma Team member in Emergency Department; JCAHO survey preparation team, Nurse Educator - presented inservices on broad range of topics for nursing staff including Critical Care Course and Orientation.

**Staff Nurse** – ICU's, Emergency Department

1996 -2003 **Director of Nursing - Subacute – Regis/St. Elizabeth's Centers, Waco, Texas**

Responsible for start-up and operation of subacute division. Provided nursing education and training to ensure nursing competencies, develop policies and procedures, standards of care and regulatory compliance.

**Staff RN, House Supervisor, MDS and Care Plans, Nursing Educator**

1996 -1999 **Home Health Nurse & Supervisor - Extra Step Home Health, the Wound Care Specialists, Waco, Texas –**

Provided nursing care and wound care to patients, nursing education, quality improvement, patient care and administrative duties.

**Synergy Healthcare –**

Provided education through inservices and workshops to nurses in Long Term Care, Hospitals, Home Health, etc.

1990-1996 **Director, Critical Care Nursing & Respiratory Therapy - Hillcrest Baptist Medical Center, Waco, Texas**

Responsible for Surgical-Trauma Intensive Care Unit and Cardio-Pulmonary Intensive Care Unit, Telemetry Unit and Respiratory Care Department

1987-1990 **Critical Care Nurse Educator - Hillcrest Baptist Medical Center, Waco Texas**

Trained new ICU nurses; Coordinator of hospital wide Unit Based Staff Development Program; Taught annual course for ICU's and Emergency Department; Responsible for Continuing Education in ICU's and ensuring competency of ICU nurses

**Coordinator of Nurse Internship Program - Hillcrest Baptist Medical Center, Waco Texas**

Started and ran Nurse Internship including hiring and training nurse interns in all clinical areas including critical care, emergency department, and med-surg

1988-1990 **Certified Nursing Assistant Program Instructor - McLennan Community College, Waco Texas**

Taught Nursing Assistant Program including clinical and didactic portions; 80 + hours course to qualify for CNA Certification

2

1986-87      **<u>Assistant Head Nurse/Head Nurse ICU</u>- Hillcrest Baptist Medical Center, Waco, Texas**

             Staff Nurse in addition to responsibility for 18-bed trauma, medical-surgical ICU; staffing, policies and procedures; budget

1983-86      **Hillcrest Baptist Medical Center, Waco, Texas**
              **<u>Staff Nurse ICU and ER</u>**

**AFFILIATIONS**

       Wound Ostomy and Continence Nurses Society
       Association for the Advancement of Wound Care
       National Gerontological Nursing Association
       Society for Post-Acute & Long Term Care Medicine
       Texas Geriatrics Society
       American Geriatrics Society
       National League for Nursing

3

Trial  (Retaining Attorney; Case/Client Name; Location; Date

Shamp Law Firm; Thomas v Mayo Clinic Health System in Waycross; GA; 1/2020
Kline Specter; O'Donnell, Pat v. Brinton Manor; PA; 1/2023
Victory, Jeffrey; Santiago; AZ; 2/2023

Depositions   (Retaining Attorney; Case/Client Name; Location; Date)

Terry Law Firm; Morales; MO; 2/2020

Levin Perconti; Schaller for Olson v Brentwood; IL; 4/2020

Bossie, Reilly & Oh; Canez v La Canada: AZ; 5/2020

Udall Shumway; Bell v St. Luke's; AZ; 6/2020

Smith Mohlman; Ragan; KS; 6/2020

Levin Perconti; Gibson; IL; 1/2021

Smith Mohlman; Pippert;   KS; 5/2021

Touchet Law Firm; Tenorio; NM; 5/2021

Levin Perconti; Bryson; IL; 9/2021

Taxman, Pollock, Murray & Bekkerman; Michael; IL; 10/2021

Bossie, Reilly & Oh; Ponaman; AZ; 10/2021

Smith Mohlman; Newman; KS; 1/2022

Rhodes Law; Meeker v Westview; WY; 2/2022

Pickett Law; Isaacks v Sierra; NM; 4/2022

Harvey & Foote; Pappas; NM; 8/2022

Helms Law Firm; Inez Davis v Twin Oaks; GA; 8/2022

Udall Shumway; Rein v LaEstancia; AZ; 9/2022

Smith Mohlman; Bitar; KS; 9/2022

Taxman, Pollock, Murray & Bekkerman; Love; IL; 12/2022

Henson Fuerst; Hooks; NC; 12/2022

Taxman, Pollock, Murray & Bekkerman; Kosieniak; IL; 2/2023

Levin Perconti; Clayton v Symphony; IL; 4/2023

Levin Perconti; Williams v Generations Applewood; IL; 5/2023

Udall Shumway; Howenstein; AZ; 5/2023

Victor, Jeffrey; Gengelbach; AZ; 6/2023

Buchanan, Thomas; Ketterer v Gasville; AR; 7/2023

Maples, Nix; Henderson v Brandford Village; OK; 11/2023

Udall Shumway; Brackenbury v Sante of Chandler; AZ; 12/2023

**Suzanne Frederick, MSN, RN-BC, CWCN**
**260 Settlers Creek Trail**
**Waco, Texas 76712**
**(254) 715-8812**
**suzanne@frederickRN.com**

## **FEE SCHEDULE**

Retainer Fee                                               $ 1,500.00

Record Review, Consultation, Written Reports              $ 175.00 / hour
and any other time dedicated to a case, i.e., travel time

Deposition and Trial                                      $ 2,000.00 flat ($\leq$ 5 hrs)

 Full payment required at least 48 hours prior to Deposition &/or Trial
 ***Deposition Fee is ultimately the responsibility of the retaining attorney***

 Cancellation Fee:
 Cancellations occurring > 48 hours before scheduled deposition &/or Trial - $ 1,000.00
 Cancellation $\leq$ 48 hours of scheduled testimony - $ 1,500.00

Travel expenses paid by attorney and required prior to travel