## Robert H. Kelly, MD PLLC
*private practice of medicine and geriatrics*

929 College Avenue Fort Worth, TX 76104
phone: 817.336.3431  fax: 817.336.5821

rkelly@robertkellymd.com

March 12, 2024

Kaylee P Davis-Maddy
Doerner Saunders Daniel & Anderson, LLP
210 Park Avenue, Suite 1200
Oklahoma City, OK  73102-5603

Re:   Case No. 5:22-CV-00772-F; Andrew Chaballa as Administrator of the Estate of Laverne
      Somers v SP Healthcare Management LLC, Midwest Geriatric Management, LLC, Judah
      Bienstock

Dear Ms. Davis-Maddy,

I have reviewed the records sent to me regarding the treatment and care of Laverne Somers.
Records included:

- Plaintiff's 2nd Amended Complaint
- Behavior & Side Effects 7_2020
- Burial papers & Burial policy
- Dr. Cooper Progress Notes:  06/19/2020; 08/11; 09/08; 09/22; 09/29
- EHR
- L Somers
- MARS & TARS
- Millennium Consult
- MVP
- Neuro Evaluation
- Pharmerica Records
- Rehab Screening forms
- OT, PT, ST records
- Expert Reports:
  - Suzanne Frederick, MSN
  - John Kirby MD

These records are adequate to understand the nature and common natural course of the diseases
Ms. Somers suffered, and the treatment and care given.  Records were sufficient to reach a
reasonable conclusion with regard to whether or not South Pointe staff were reasonable, prudent,
and acting within the appropriate standard of care in their treatment and care of Ms. Somers and
the cause of death.



EXHIBIT
A

Chaballa/Somers v South Pointe
March 12, 2024
Page 2

I am qualified to give an opinion on this matter.  I am very familiar with the standard of care as it applies to facilities like South Pointe and its staff members (RN, LVN/LPN, CNA & Allied Staff) caring for a resident like Ms. Somers.  I work with RNs and LVNs/LPNs daily, directly assessing their work and care, especially of my patients and residents.  In addition to my work as Medical Director, I have served on multiple hospitals and facility committees that oversee the work of LVNs/LPNs and the applicable standard of care.

Since 1984, I have been board-certified in Internal Medicine.  I have maintained a specialty in Internal Medicine, Geriatric Medicine, Hospital Medicine, and Long-Term Care Medicine.  Daily I provide ongoing care of patients/residents at hospitals, nursing homes and rehabilitation facilities (post-acute and long-term care facilities), and on hospice and home health services.  At intervals since 1986, I have served as Associate Medical Director at Odyssey Hospice (now Kindred Hospice) and at other long-term post-acute care facilities.  On 01/01/2018, I resigned my role of Medical Director at Stonegate Senior Care Center in Fort Worth.  I am on the medical staff at Texas Health Harris Methodist Hospital Fort Worth, Baylor Scott & White Medical Center Fort Worth, Texas Rehabilitation Hospital of Fort Worth, and Texas Health Resources-Texas Health Specialty Hospital.

I am familiar with the diseases Ms. Somers suffered, and the diagnoses, treatments, and complications related to these diseases.

## CLINICAL SUMMARY

Ms. Laverne Somers was born on October 5, 1934.  She was admitted to South Pointe Rehabilitation (South Pointe) on 08/11/2016.

On June 19, 2020, Tami Altstatt, Nurse Practitioner (NP), recommended continuing current therapy.  Diagnoses included dementia, generalized anxiety disorder, major depressive disorder, panic attacks, weakness, delusions, aphasia, extrapyramidal syndrome, psychosis, B12 deficiency and falls.

On 07/01/2020, a nurse's note shows that Ms. Somers was found sitting on the floor without sign of injury.  Vital signs were normal.  On 07/06, nurse practitioner refers to her being found on the floor, likely referring to events on 07/01/2020.

On 07/07, social service visited and made note of dementia (BIMS score of 6: normal BIMS is 13-10; scores < 11 reflect dementia).  Note was made of ocular prosthesis or glass eye on the left side.

On 07/17, nurse's record a self-reported fall early in the morning.  She said that "someone" helped her up.  It is not definite that there was a fall.  Dr. Drew Cooper was notified.  No signs of injury was noted, but there was neck pain especially with turning.  A towel was used to brace her neck and improve her comfort.  The problem with pain and difficulty turning her head continued.

Chaballa/Somers v South Pointe
March 12, 2024
Page 3

On 07/21, neck pain was associated with vomiting, and she was sent out to the emergency room. On 07/22, she returned from the emergency room wearing a Miami-type rigid cervical collar.

There was a diagnosis of a fracture of the second cervical vertebrae, but no report or recording of any significant change in her neurologic examination or functional status.

On 07/24, LaTasha Day, FNP visited and noted Ms. Somers' return to the facility and diagnosis of cervical compression fracture. On 07/28, nurses note refusal to wear the neck collar and some decline in her health since the fall. On 08/03, NP Day visited and made note of reduced health related both to the fall and a move to a new room. A decision was made, and she was returned to her prior unit at South Pointe.

On 08/07, NP Day ordered Klonopin 1 mg twice daily. On 08/09, Ms. Somers' son Andy complained that his mother seemed "drugged up." She was able to stand and ambulate with minimal assistance. No change was made in the Klonopin dose.

On 08/11, Dr. Cooper visited and made note of her fall, injury, use of a cervical collar, absence of pain and in intact ability to self-propel her wheelchair short distances. He noted that she was alert, confused, weak, and acting fairly well. This was her baseline level of activity as reflected in the chart.

On 08/24, she was found lying on the floor of her room. Wheelchair tipped over. No other sign of injury. Room change on 08/26.

Standing with the CNA during transfer of care on 08/27, Ms. Somers fell. She landed halfway on the bed and halfway on the ground. No sign of injury from this fall.

On 09/03/20, she developed COVID-19 infection. NP Day ordered azithromycin, vitamin D and zinc therapy for the COVID infection. Cough was noted, but lungs were clear. Nurse Practitioner visited again on 09/09 and noted no significant change in exam since 9/03.

On 09/08, Dr. Cooper visited and noted that the prior cervical fracture was causing no symptoms. There was generalized weakness. Weakness was also noted by physical therapy and occupational therapy in April 2020. Weakness was chronic. On 09/11, a week after developing COVID 09/03/20, there was decreasing function and vigor. She refused fluids and food. She complained of pain all over and at times would not open her eyes. O2 sat was low at 77%.

On 09/12, she was noted to be drowsy and pale. Decline was noted since her COVID-19 infection. She was transferred to the hospital. These records are not available. She returned to South Pointe on 09/16. There was persisting hypoxia (89%). COVID infection was in reasonable medical probability the cause of her decline in September and October 2020.

On 09/22, Dr. Cooper visited and made note of Ms. Somers' refusal to wear the cervical collar, she was oriented x2 and in no distress. He did not note any paralysis, radiculopathy, pain, change in exam, strength or other evidence to suggest spinal cord injury. By 09/30, NP Day

Chaballa/Somers v South Pointe
March 12, 2024
Page 4

observed that Ms. Somers was not eating much, was fatigued, anorexic, and recovering from her COVID infection.

On 10/03, there were increasing behavior problems common in residents suffering from progressive dementia, including disrobing, and refusing of food despite assistance. On 10/09, she was out to see the neurosurgeon regarding her C2 fracture. No further visits were needed. Amy Greco, P.A., a mental health specialist with Millennium, was also visiting and noted the decline in her condition since her COVID infection.

On 10/10/2020, NP Day visited and noted discharge and redness of the right eye likely caused by infection. She ordered polymyxin topical treatment for possible conjunctivitis. Erythema and purulence continued through 10/12 when NP Day, again visited.

Meals which were frequently refused. Ms. Somers' appetite was poor. Nutrition was compromised, also common post COVID infection in person with dementia. Dr. Cooper was notified about the poor meal intake and ordered laboratory tests to be done. These showed a hemoglobin of 10.3 (anemia). Labs were otherwise normal (CBC, CMP, and UA). On 10/13, Remeron was ordered to help stimulate intake. On 10/14, NP Day visited and noted poor nutrition, lack of usual coordination/judgment in wheelchair use and smearing of feces on the walls of her room. These are common clinical signs of severe, progressive Alzheimer's disease.

On 10/15, NP Day ordered doxycycline for purulence (sign of infection) in the right eye. Vital signs were normal on 10/16 and 10/17. Doxycycline was delivered on 10/18 and/or 10/19 from the pharmacy.

On 10/19, there was a fall. Dr. Cooper was notified. No sign of injury initially, but on 10/20, bruising was noted over the left forehead. Doxycycline was continued. On 10/22, she suffered a fall under her left side. There was some pain, blood, or discharge noted from the right eye. She was sent to the emergency room at Integris Southwest on 10/22 and returned to South Pointe for diagnosis of ruptured right eye. This had required surgery. The right eye remained red and ofloxacin eye drops were ordered. Blindness was not reported.

On 10/24, vital signs were normal. No pain or discomfort reported. On 10/25, there was no pain or discomfort in the left eye. It was said to be okay. This may be a right/left error. She had no left eye. On 10/26, she was up in the early part of the day. There was no pain or discomfort. She was taking about 25% of her meals. At 5:30 p.m., a dinner tray was taken to her, and she began eating. No problems were reported or observed. When staff returned to remove the dinner tray approximately 1 hour later, they noted that she was not breathing or responding. CPR was initiated. The RN contacted the medical director and 911. Information was exchanged and she was advised to discontinue. Time of death was called at 6:23 p.m.

Chaballa/Somers v South Pointe
March 12, 2024
Page 5

## STANDARD OF CARE

Standard of care for a facility like South Pointe caring for a resident like Laverne Somers in skilled care from July through October is:

1. Assessing long-term care needs.
2. Planning to meet long-term care needs.
3. Monitoring long-term care needs.
4. Advising a clinician and physician of significant change of condition.

Standard of care was met.

Assessment of long-term care needs was appropriate. Admission assessments were done, for example, on 10/23. Interdisciplinary team collaborated in assessment and care including physical therapists, occupational therapists, social worker, mental health specialists, and podiatrist. Restorative care provided assessment and treatment. For example, in July 2020. Standardized assessment tools such as Minimum Data Set (MDS), pain score, Braden score, and smoking safety assessment were completed. MDS was completed at appropriate times. Use of standardized forms, completion of the MDS, and the participation by interdisciplinary team, reflect a facility and staff operating within a reasonable and prudent standard of care.

Planning was appropriate. Extensive care plans (approximately 20) were in place. Care plan was in place for falls and debility with measures reasonably expected to reduce fall risk. The Medication Administration Record and Treatment Administration Record as well as the ADL sheets reflect planning to provide medical treatment ordered by her physicians. Appropriate assistance was planned for ADLs, documented in the ADL sheets. Planning was reasonable, prudent, and within the standard of care.

Monitoring of long-term needs was appropriate. Nurse's notes were written at appropriate intervals. Vital signs were recorded on most days. Skin checks were done. From 07/20-10/20, NP Day visited 19 times, Dr. Cooper four times, and Millennium Behavioral Medicine therapist six times. 29 visits by clinicians occurred during this period of time added to appropriate monitoring and care by South Pointe. Monitoring her needs was reasonable, prudent, and within the standard of care.

Significant change of condition was appropriately reported. Because of her frequent patient visits, NP Day was the first clinician to notice the infection in the right eye and ordered treatment with Polysporin. It is this conjunctivitis which may likely have led to a diagnosis of right eye injury on 10/22, (records from the hospital are not available). Significant changes that were reported included the falls on 07/01, 07/17, 08/24 and 10/22. Notifying clinicians of significant change of conditions was reasonable, prudent, and within the standard of care.

Fall risk was appropriately reduced. Fall risk assessment was done on 07/01, 07/17, 08/24, 10/22 and 10/23. Each documented Morse Fall Scale greater than 50 (e.g., 167, 171) Scores 0-25 reflect likely average risk. Scores >50 high risk. Prudent steps were in place to reduce fall risk.

Chaballa/Somers v South Pointe
March 12, 2024
Page 6

The call light was kept close.  She was reminded to call for assistance.  Discussed in detail in a later section, significant elements of the care plan included:

1. Concave mattress to clarify mattress borders.
2. Low bed kept at its lowest possible level.
3. Engagement in exercise and active community meetings.
4. Wear appropriate shoes and nonslip footwear.
5. Remove clutter from the room.
6. Anticipate and meet for the resident's needs.

The care plan to reduce falls was initiated in 2016 and updated several times in 2020 including 03/02/2020, 04/13/2020, 05/23/2020, 07/17/2020, and 08/03/2020. Planning to reduce fall risk was individualized, reasonable, prudent, and within the standard of care.  At all times, South Pointe Rehab acted reasonably and prudently, providing effective long-term care to Ms. Somers that was within the reasonable and prudent standard of care.

**DECLINE WAS UNAVOIDABLE**

Decline in October was caused by chronic dementia and acute COVID-19 infection.  After diagnosis of COVID-19 on 09/03, there was evidence of rapid deterioration.
1. 09/09: increasing fatigue, refusal of meals, and lethargy.
2. 09/10: would not drink or speak, refused meals and would not open her eye.
3. 09/12: drowsiness, pale complexion.  Sent to the ER for evaluation.
4. 09/03-10/01:  Repeated reference to poor intake.
5. 10/13:  reference to anorexia (prior diagnosis of anorexia nervosa).
6. 10/14: smearing feces in her room and disrobing.

Reflected in NP Day's progress note of 10/14, behaviors reflect progressively severe dementia. Severe dementia had been previously documented in the MDS by a BIMS score of 6 on 07/21 and 10/22.  Progression of these signs of disease in reasonable medical probability reflected CNS injury from the acute hyperinflammatory/hypercoagulable effect of the COVID-19 infection and chronic, progressive dementia.

Severe COVID-19, acutely and dementia, chronically, led to Ms. Somers decline and death.

Cervical fracture appeared to have minimal effect on her health and played no role in her death. In physical therapy and occupational therapy assessments in April and September, there was little change.  Physical therapy noted that the timed up and go test (TUG) and the 30-second stand test were both zero, demonstrating the profound nature of her functional impairment preceding falls in July or October.  Occupational therapy noted worsening weakness.  Upper extremities strength changed from 4/5 to 3+/ 5.  This is clinically not significant.  Dressing independence deteriorated somewhat from minimal upper extremity, moderate lower extremity to moderate upper extremity dependent lower extremity.  These reflects the effect of severe dementia and its progression.

Chaballa/Somers v South Pointe
March 12, 2024
Page 7

Ocular disease and injury preceded her fall on 10/22.  On 10/10, NP Day noted ocular exam showing redness and discharge from the right eye.  Initially, polymyxin was ordered and then this was changed to doxycycline.  After a trip to the hospital on 10/22, the polymyxin was changed to ofloxacin.  Eye problems did not seem to have been a substantially change on 10/23-10-26 at South Pointe.  It is speculation, given the preexisting problems and the limited recommended treatment, to claim that injury to the eye was the cause of her death.

**FALLS WERE UNAVOIDABLE**

Ms. Somers suffered as many as 17 falls from March 16, 2020, through October 22, 2020.  These falls did not follow a pattern.  There were falls in her room, dining room, bathroom, and nurse's station.  There were falls while standing, transferring, walking, and there were falls from a wheelchair and from bed. As reflected in NP Day's note of 08/03, Ms. Somers refused assistance, would wander, and had increasing confusion.  Psychosis, dementia, impulsiveness, resistance to care were also identified, and a preference for moving at will were documented.  Combined with Ms. Somers' ability and choice to stand, walk, and transfer independently but unsafely, falls will unavoidably occur.

Persons living in long-term care will at times be left alone.  Long term care facilities provide a home like atmosphere and environment where a person with functional impairment and skilled care needs can make their home and live comfortably.  Long-term care facilities like Southpointe do not provide 24-hour eyes-on and hands-on care.  That is not the nature of a skilled nursing facility and long-term care.

Even with full-time one-on-one staffing (which is still not continuous 24-hour hands-on, eyes-on care), Ms. Somers would in reasonable medical probability still have fallen.  Falls occurred while she was monitored as well as when she was left alone – falls occurred in diverse locations.  There was no safe place where she could sit, lie or stand without a risk of fall.

Falls were not caused by being left alone or momentarily unobserved in her room, bed, wheelchair, nurse's station, or in the dining room. In all locations there was supervision - intermittent and ongoing monitoring 24 hours a day, but it was not continuous.

Falls were caused by illness and neurocognitive impairment as documented in the medical record, which caused the following signs and symptoms, including:

1. Disorientation
2. Aphasia
3. Dementia
4. Weakness
5. Confusion
6. Unsteady gait
7. Resistance to care

8. Extrapyramidal syndrome
9. Psychosis
10. Delusions
11. Decreased safety awareness
12. Medication side effects
13. Muscle weakness
14. Impulsivity
15. An element of self-neglect (unaware of safety)

These diseases caused a high fall risk which was recognized by the staff at South Pointe. There is no practical way that this risk could be reduced more than it was.

This problem of falls was recognized by clinical staff at South Pointe who made prudent effort to put together a program to reduce the risk of falls. The problem with repeated falls also was recognized, identified, and documented by NP Day, PA Greco, Dr. Cooper, Podiatrist Li, clinical staff at Integris Hospital and the family. All those who had an interest in the well-being of Ms. Somers and who could control or elect where she would spend her days were aware of the inability to prevent falls at South Pointe. Yet, all those involved in her care elected continued care at South Pointe. All were aware of the frequent falls. All were aware of the inability to prevent falls. All were aware that there had been injury from falls, and all elected to continue care at South Pointe. This is because, especially amongst the clinical professionals, there was awareness and understanding that falls in patients like Ms. Somers, with such disease as she suffered, cannot be prevented. Her falls and injuries were unavoidable.

**PLAINTIFFS EXPERTS**

Dr. John Kirby did not state in his report what additional fall interventions would have prevented Ms. Somers' falls, especially her fall on 07/24 and 10/22 when there was injury. He did not identify what intervention or prevention would have prevented these falls. He simply claimed that there should have been an individualized fall reduction program. This is an odd claim, as there was an individualized fall reduction program in her chart.

The presence of a fall reduction plan specifically designed for Ms. Somers was identified, and criticized, in both nurse Suzanne Frederick's and Dr. Kirby's reports. This fall reduction program included the following elements:

1. Fall risk assessment
2. Nursing care plan for fall reduction
3. Physical activities
4. Physical therapy, occupational therapy
5. Restorative care program
6. Activities and community structure
7. Assist devices, such as wheelchair
8. Shoes on when ambulating

Chaballa/Somers v South Pointe
March 12, 2024
Page 9

   9.  Concave mattress
  10. Low bed
  11. No clutter or accident hazard
  12. Dry floor
  13. Glare-free light
  14. Call light and encouragement to use the call light
  15. Personal items kept within reach
  16. Room rearrangement for increased safety
  17. Timed toileting between meals and at bedtime
  18. A policy to meet her needs
  19. Transfer to a secure unit
  20. Hand rails on the walls

This is an individualized, reasonable, and prudent fall reduction program. Neither nurse Frederick nor Dr. Kirby identifies a specific or unique element of care or environment which, added to the fall reduction efforts in place at Southpointe, would have prevented her falls.

Even if one significant intervention was identified as missing, there is no scientific merit to the claim that adding a missing element to a program of fall risk reduction will significantly reduce the risk of falling. Multiple efforts are found in scientific literature to identify some element of a care program which, when added to a generic or pre-existing program, will significantly reduce fall rates. Studies have failed to show that adding some prudent, unique element to fall reduction will significantly impact fall rates. But scientific work has repeatedly confirmed that a facility or unit with fall risk program in place will experience fewer (not zero) falls compared to a facility without a fall risk reduction program. It is not any individual element of a fall risk reduction program, but the presence of the fall risk reduction programs which reduces fall risk. This is the type of fall risk reduction program that was in place for Ms. Somers. Her fall did not occur because of an absence of a program, but because of the presence of severe disease.

Neither Dr. Kirby nor nurse Frederick addressed the fact that evidence of eye infection preceded the fall and injury on 10/22. It is speculation to say that the need for consultation and eye care (even eye surgery) would have been prevented or avoided if a fall on 10/22 had not occurred. There was eye infection that was persisting and specialized treatment was needed even before the fall on 10/22.

Neither Dr. Kirby nor nurse Frederick addressed the fact that clinicians, specifically Dr. Cooper and NP Day, visited 16 times at South Pointe to care for Ms. Somers from 06/19 through 10/22. These clinicians were well aware of the problem of falls. They were well aware of the program of care which was in place. They were well aware of the opportunity to transfer Ms. Summers to a different facility or to the hospital. Each of these clinicians could elect to move Ms. Somers to live her days in a hospital or other higher level of care. But during 16 visits and with keen awareness of the problem of falls, these clinicians did not recommend moving her to live in a different facility with a higher level of care. In reasonable medical probability, this is because they recognized that there was no practical, prudent, or reasonable intervention or available

Chaballa/Somers v South Pointe
March 12, 2024
Page 10

facility that could prevent the signs and symptoms of her severe neurocognitive disease and psychotic illness. This illness was the cause of her falls, and this illness could not be cured.

For these and other reasons, I disagree with Dr. Kirby's opinion and nurse Frederick's opinion that any action or failure to act by South Pointe caused or allowed falls to occur or caused or allowed injuries to occur which would not otherwise have occurred. I especially disagree with their claim that treatment and care by the staff at South Pointe was below the standard of care or contributed to her illness.

I also disagree with the cause of death listed by the medical examiner without the benefit of autopsy. There were no signs or symptoms of complication related to her eye injury on 10/22 or after 10/22.

**SUMMARY**

Laverne Somers was a frail, weak, and demented long-term care resident at South Pointe for more than three years. From July through October 2020, there were multiple falls. In July, a cervical spine fracture was reported. This may have been caused by one of her falls. This fracture appeared to cause little impairment and she was released from further neurosurgery, orthopedic care on 10/09. The severity and progression of her dementia and debility, combined with acute COVID infection, caused her terminal decline and death.

At all times, South Pointe Rehab and its staff acted reasonably, prudently, in compliance with the applicable standards of care. No action or failure to act by South Pointe caused injury to Ms. Somers, allowed injury or disease to progress, which would not otherwise have occurred or progressed or in any way caused her death and illness in October.

My opinions are based upon my education, experience, training, and relevant medical literature. They are expressed to a reasonable degree of medical probability. They are based upon the reasonable and prudent standard of care applicable to similar settings, patient/resident needs, and circumstances. Given further review, additional medical records, and/or deposition, I retain the right to modify and amend these opinions. Given adequate opportunity and notice, I will appear at deposition and trial to answer questions and explain my opinions as needed.

Sincerely,

Robert H. Kelly, M.D. F.A.C.P.

**Robert Hart Kelly, MD FACP**
**Robert H Kelly, MD, PLLC**
**929 College Avenue**
**Fort Worth, Texas 76104**
**Main Office: (817) 336-3431      Fax (817) 336-5821**

## PERSONAL DATA

| | |
|---|---|
| Birth date: | 1955, Fort Worth |
| Languages: | English and Spanish |

## EDUCATION

| | |
|---|---|
| 1973-1977 | Amherst College, Amherst, Massachusetts |
| | Bachelor of Arts in Psychology |
| | Bachelor of Arts in Neurosciences |
| 1977-1981 | University of Texas Medical School in Houston, Texas |
| | Honors in Internal Medicine, Infectious Diseases, Pediatrics |
| 1980 | Four-month postgraduate externship at Oxford University, Oxford, England |

## POSTGRADUATE TRAINING

| | |
|---|---|
| 1978 | Student fellowship, National Institutes of Health with Bryan Bradley, M.D. |
| 1981-1982 | Oklahoma State Teaching Hospitals internship in Internal Medicine |
| 1982-1984 | Residency in Internal Medicine |
| 1987 | Postgraduate course in Geriatric Medicine |
| | University of California at Los Angeles Medical School; |
| | Los Angeles, California |
| 2003 | Symposium on wound care |

## LICENSURE

| | |
|---|---|
| 1981-Present | Texas (F9658) |
| 1981-1984 | Oklahoma |

## CERTIFICATIONS

| | |
|---|---|
| 1984- Present | Internal Medicine, Certified by the American Board of Internal Medicine |
| 2007-2016 | Board Certified Geriatric Medicine |
| 1988-1998 | Special Board qualifications in Geriatric Medicine |
| 1988-2006 | Certified 16 times by the American Medical Association, with Physician's Recognition Award for continued medical education; current certificate valid through 2007. |

Robert Hart Kelly, MD, FACP
Robert H Kelly, MD PLLC
Page **2** of **8**

---

## CERTIFICATIONS (Continued)

| | |
|---|---|
| 2000 | Fellow, American College of Physicians |
| 2001 | Certified NIH Stroke Scale Assessment |

## HOSPITAL STAFF PRIVILEGES

| | |
|---|---|
| Attending Physician | Texas Health Harris Methodist Hospital Fort Worth, Texas (Active) |
| Attending Physician | Baylor Scott & White All Saints Medical Center Fort Worth (Courtesy) |
| Consulting Physician | Texas Health Specialty Hospital (Active) |
| Courtesy Physician | Texas Rehabilitation Hospital of Fort Worth (Active) |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 1984-Present | Specialist in Internal Medicine,<br>Specialist in Geriatric Medicine<br>    1001 Pennsylvania Avenue, Fort Worth, Texas (1984)<br>    929 College Avenue, Fort Worth, Texas (1984-Present) |
| 1984-1986 | Board of Directors, Harris Health Ventures |
| 1986-1987 | Medical Director - Prudential of North America, North Texas Region<br>(Immediate Supervisor - Rusty Folk) |
| 1988-1989 | Medical Director - Quality Care Nursing Home, Fort Worth |
| 2002-2005 | Medical Director - Texas Senior Care, Fort Worth |
| 2005-2007 | Medical Director - Community Care Center of Fort Worth |
| 2006-2008 | Associate Medical Director - Odyssey Health Care |
| 2007-2010 | Medical Consultant - Advantage Home Care |
| 2009 | Interim Medical Director – Wellington Oaks Rehabilitation |
| 2007-2010 | Medical Director – Medicare Unit, Fort Worth Nursing and Rehabilitation Center |
| 2010-2011 | Medical Director - Lotus Home Care |
| 2009-2018 | Medical Director – Stonegate Senior Care Center |

## PROFESSIONAL SOCIETY MEMBERSHIPS

2014-2021    Adjunct Clinical Assistant Professor in the Department of Internal Medicine
in the Texas College of Osteopathic Medicine

2020 – 2023    Adjunct Clinical Assistant Professor in the Department of Internal Medicine and Geriatrics
University of North Texas Health Science Center at Fort Worth

1984-Present    Texas Medical Association (TMA)

1984-Present    Tarrant County Medical Society (TCMS)

1986-Present    American College of Physicians (ACP)

2013-Present    Texas Geriatrics Society (TGS)

2005-Present    American Medical Directors Association (AMDA)

2005-Present    Texas Medical Directors Association (TMDA)

2007-Present    Gerontological Society of America (GSA)

Prior              Mayo Clinical Trial Services (MCTS)
The American Geriatrics Society (AGS)
American Medical Association (AMA)
American Society of Parental Nutrition (ASPN)
American Society of Critical Care Specialists (ASCCS)
American College of Nutrition (ACN)
American Society of Parenteral and Enteral Nutrition (ASPEN)

## CURRENT COMMITTEE MEMBERSHIP

2022 - Present  Medical Records Committee, Texas Health Harris Methodist Hospital Fort Worth

## PAST COMMITTEE MEMBERSHIPS

- Quality Improvement, Harris Methodist Select
- TCMA Physician's Health Committee
- Pharmacy and Therapeutics, Harris Methodist Health Plan
- Stroke Committee, Texas Health Harris Methodist Hospital Fort Worth
- Ethics Committee, Plaza Medical Center
- Clinical Events Committee, Baylor All Saints Hospital
- Risk Management Committee, Texas Health Harris Methodist Hospital Fort Worth
- EKG Panel, Texas Health Harris Methodist Hospital Fort Worth and Baylor All Saints Hospital
- EKG Committee, Texas Health Harris Methodist Hospital Fort Worth
- Public Grievance Committee, Tarrant County Medical Society
- Medical Records Committee, Texas Health Harris Methodist Hospital Fort Worth

---

## PAST COMMITTEE MEMBERSHIPS (Continued)

- Continuous Improvement Committee, Texas Health Harris Methodist Hospital Fort Worth
- Credentials Committee, Texas Health Harris Methodist Hospital Fort Worth

## PAST COMMITTEE CHAIRMANSHIPS

| | |
|---|---|
| 1985-1988 | Credentials Committee, PruCare of North Texas |
| 1986-1988 | Quality Assurance Committee, PruCare of North Texas |

## AWARDS AND RECOGNITIONS:

| | | |
|---|---|---|
| 2001-2021 | Fort Worth, Texas Magazine | Best in: Internal Medicine; 2001 2002<br>Best in: Geriatrics; 2021<br>Best in: Primary Care Medicine 2002 |
| 2003 | Fort Worth Business Press | Health Care Hero |
| 2006-2021 | United Healthcare | Quality and Efficiency Designation |
| 2006-2007 | Blue Cross Blue Shield | Awarded Dark Blue Ribbon of EBM |
| 2011-2023 | Castle Connolly | Top Doctor, USA, Geriatrics, Internal Medicine |
| 2014-2021 | Vitals Patients Choice Award | Patient Choice 2014, 2016, 2018, 2020, 2021<br>Compassionate Doctor 2020, 2021<br>On-Time Doctor Award 2020 |
| 2015-2023 | Texas Monthly Magazine | Texas Super Doctors, Internal/Geriatrics Medicine |
| 2015-2023 | American Registry | Various Awards<br>Most Honored Doctors—Top 1% 2022 |
| 2017-2020 | American College of Physicians | General Internal Medicine Statewide<br>Preceptorship Program |
| 2017 | Senior Care of Stonegate | Awards earned by facility:<br>   5-Star Facility Designation<br>   Circle of Excellence Winner<br>   Health Survey Excellence "Deficiency Free" |
| 2019-2021 | 360 West Magazine | Top Doctors: 2019, 2020, 2021 |
| 2020-2022 | American Registry | America's Most Honored Doctors |
| 2021 | Texas Magazine | Top Geriatrician 2021 |

---

## PRESENTATIONS

| | |
|---|---|
| 10/15/2002 | Texas Senior Care<br>"Patient Care Documentation" |
| 01/18/2003 | Moderator, CME conference/seminar<br>"Current Management of Stroke Overview" |
| 06/11/2003 | Plaza Medical Center<br>Ethics Presentation, Ethics Committee, |
| 09/16/2003 | Texas Senior Care<br>"Pain and Home Care Assessment" |
| 01/11/2006 | Plaza Medical Center<br>"Contextual Features in Medical Ethics" |
| 11/27/2006 | Harris Methodist Hospital - Unit Nurses<br>Hospice Q&A |
| 01/09/2007 | Odyssey Health Care<br>"Latitudinal Aspects of Ovarian Carcinoma" |
| 01/16/2007 | Odyssey Hospice<br>"Amyloidosis Diagnosis Treatment and Survival" |
| 02/07/2007 | Odyssey Hospice<br>"Hypertension in Hospice Care" |
| 02/09/2007 | Harris Methodist Hospital - Nursing In-Service<br>"Breaking the Bad News" |
| 03/21/2007 | Odyssey Health Care In-Service<br>"Ten Ethical Principals in Geriatric and Long-Term Care" |
| 04/04/2007 | Karnofsky Performance Scale and Hospice Election |
| 04/05/2007 | Harris Methodist Hospital - Nurse Care Managers and Social Workers<br>"End Stage Dementia and Alzheimer's Disease" |
| 07/18/2007 | Odyssey Hospice<br>"Discontinuation of implanted cardiac defibrillator in end of life care" |
| 09/26/2007 | Management of intractable nausea and vomiting in patients at end of life. |
| 10/10/2007 | "Biochemical basis of frailty" |
| 11/28/2007 | Long Term Non-Cancer Hospice Care |

Robert Hart Kelly, MD, FACP
Robert H Kelly, MD PLLC
Page **6** of **8**

---

**PRESENTATIONS (Continued)**

| | |
|---|---|
| 12/12/2007 | Alzheimer's Disease at Hospice Care |
| 01/16/2008 | Asking the Right Questions: Hospice Care Delivered at Odyssey Hospice |
| 01/23/2008 | Satisfaction in Long Term Care; Low Intensity versus High Intensity Utilizers at Odyssey Hospice |
| 01/24/2008 | Atypical Antipsychotics and Long-Term Care presented at Fort Worth Nursing and Rehab |
| 01/30/2008 | Disease Specific Charting for Hospice Prognosis |
| 02/20/2008 | Hospice "Influenza Season" |
| 11/06/2008 | CRP Resuscitation Rates and Survival: Application of DLS/ACLS Protocols in announcement of death prior to transferring Fort Worth Nursing and Rehabilitation |
| 03/26/2009 | Aging Successfully Fort Worth Nursing and Rehabilitation - Education Conference |
| 04/02/2009 | Treatment and Preventative Care In Agitated Dementia Fort Worth Nursing and Rehabilitation |
| 04/17/2009 | Community Living Elders: Falls, Psychotropics, and Fluid Intake |
| 05/07/2009 | Fort Worth Nursing and Rehabilitation: Delirium Diagnosis, Risk Factors and Impact |
| 07/23/2009 | Fort Worth Nursing and Rehabilitation: Nutrition Versus Cachexia Beyond Bingo: Meaningful Activities for Persons with Dementia in Nursing Homes |
| 08/14/2009 | Fort Worth Nursing and Rehabilitation: Concomitant use of Anticholinergics, Acetylcholinesterase Inhibitors Risk and Complications |
| 08/21/2009 | Fort Worth Nursing and Rehabilitation: Benefits of Arginine Containing Supplements and Wound Healing |
| 09/07/2009 | Fort Worth Nursing and Rehabilitation inservice: Influenza, Seasonal and Novel, Prevention and Treatment |
| 09/24/2009 | Guardianship Services of Tarrant County: Dementia and Common Geriatric Conditions |

---

**PRESENTATIONS (Continued)**

| | |
|---|---|
| 11/13/2009 | Fort Worth Nursing and Rehabilitation:<br>Admissions Process and Quality Control |
| 06/06/2010 | Fort Worth Nursing and Rehabilitation:<br>Delirium, Anorexia, and Quality of Care; Intervention Needed |
| 07/15/2010 | Fort Worth Nursing and Rehabilitation:<br>Non-pain Symptoms May be Underreported and Undertreated |
| 07/29/2010 | Fort Worth Nursing and Rehabilitation:<br>Delirium and its Effects |
| 08/04/2010 | Fort Worth Nursing and Rehabilitation:<br>Contractures in Nursing Home Residents |
| 08/19/2010 | Fort Worth Nursing and Rehabilitation:<br>Hypertension in the elderly |
| 09/09/2010 | Fort Worth Nursing and Rehabilitation:<br>Anticholinesterase Inhibitor Treatment in Advanced Alzheimer's Disease |
| 01/10/2012 | Texas State Bar CLE Webcast:<br>Giving Life to Living Wills and Incapacity Documents, Moderator Dyann McCully; Co-Panelists Lisa Jameson, Jay Harnett, Albert Gros MD |
| 09/18/2012 | Stonegate Nursing Center:<br>When to call, What to call. |
| 02/21/2017 | Stonegate Senior Care Center:<br>Professionalism in Long-Term Care |
| 03/21/2017 | Stonegate Senior Care Center:<br>Scabies—Overview |
| 04/18/2017 | Stonegate Senior Care Center:<br>Dementia—A Terminal Disease |
| 05/16/2017 | Stonegate Senior Care Center:<br>Delirium Assessment / Role in Dementia |
| 06/20/2017 | Stonegate Senior Care Center:<br>The Four Key Elements of Warfarin Orders |
| 07/18/2017 | Stonegate Senior Care Center:<br>Tuberculosis: The Basics |

Robert Hart Kelly, MD, FACP
Robert H Kelly, MD PLLC
Page **8** of **8**

---

**PRESENTATIONS (Continued)**

08/15/2017     Stonegate Senior Care Center
Medication/Behavioral Intervention for the Demented Patient with Behavioral Problems

09/19/2017     Stonegate Senior Care Center
Rational Use of CPR in Long-term Care

10/17/2017     Stonegate Senior Care Center
Contractures in Nursing Home Residents

11/21/2017     Stonegate Senior Care Center
Frailty in Long-term Care Residents

12/19/2017     Stonegate Senior Care Center
Transition from Skilled Care to Home:  The Role of Home Health

# Robert H. Kelly, MD, PLLC

Internal Medicine, Geriatric Medicine, Hospital Care & Long-term Care
929 College Avenue, Fort Worth, Texas 76104
Office: 817-336-3431
EIN:  84-3777166

# FEE SCHEDULE

Effective date:  January 1, 2024

| DESCRIPTION | FEE | NOTES |
|---|---|---|
| RETAINER FEE | $2,500 | The retainer fee is required at time of acceptance of case and will be applied to the first invoice for services rendered. |
| REVIEW OF RECORDS TELEPHONE CONFERENCES | $500 PER HR | Record review and telephone conference call fees are calculated on a per hour rate but will be divided proportionately in 15-minute increments. |
| ADMINISTRATIVE SERVICES | $125 PER HR | Technology and administrative charge |
| DEPOSITION (4 hr minimum) | $600 PER HR | Depositions and court appearances require canceling office appointments and minimum fees will be applied. |
| COURT APPEARANCE (4 hr minimum) | $600 PER HR | Unless otherwise agreed, cancellation fees are as follows: >3 business days' notice – no fee incurred ≤3 business days' notice – 4 hours minimum fee ($2,400)  Prepayment is required prior to appearance. |
| OUT OF TOWN TRAVEL | $6,000 Per diem plus, travel/lodging expenses | Prepayment is required for out-of-town appearances. |

**We prefer records to be sent electronically or on flash drive in PDF Searchable format.**

Robert H. Kelly, M.D.

Your signature below signifies the agreement to pay Dr. Robert H. Kelly, M.D. PLLC as outlined above.
**Please complete, signa, and e-mail this fee schedule to:  legal@robertkellymd.com.**

_____
Authorized Signature                              Printed Name                                    Date

Law Firm Name: _____     Phone #: _____

Address:  _____

E-Mail Address:  _____

Robert H. Kelly, M.D.
929 College Avenue
Fort Worth, Texas 76104

TRIAL / ARBITRATION TESTIMONY
2020 - 2024

Effective:  February 13, 2024

As requested, following is my list of trial / arbitration testimonies.
I have prepared this list to the best of my ability.

| RETAINING ATTORNEY | CASE/CLIENT NAME | LOCATION | YEAR |
|---|---|---|---|
| Crenshaw, Dupree & Milam, LLP | Lara, Jose v<br>Texas Mutual Insurance | Lubbock, TX | 2020 |
| Hallett & Perrin, PC | Isaac v<br>Heritage at Longview | Longview, TX | 2022 |
| Hastings Law Firm, PC | Sturgill v<br>Richmond Healthcare Center | Houston, TX | 2022 |
| Adelman Law Firm | Howard v<br>Nexion Health at Natchez | Natchez, MS | 2022 |
| Wilson Elser Moskowitz<br>Edelman & Decker LLP | Cipollini/Murphy v<br>Woodland Pond | Albany, NY | 2023 |
| US Department of Justice | Warrick v<br>United States of America | Chicago, IL | 2024 |

Robert H. Kelly, M.D. PLLC
929 College Avenue
Fort Worth, Texas 76104
DEPOSITION TESTIMONY LIST
2020 - 2024

Updated:  March 13, 2024

This list has been prepared to the best of my ability.

| RETAINING ATTORNEY | CASE STYLE | LOCATION | YEAR |
|---|---|---|---|
| Stewart, Wiegand & Owens, PC | Guthrie/Ellison v Heritage Trails | Dallas, TX | 2020 |
| Horne, Rota, Moos, LLP | Alex v GAA | Houston, TX | 2020 |
| Stewart, Wiegand & Owens, PC | Sumerlin v San Jacinto Manor | Dallas, TX | 2020 |
| Hallett & Perrin, PC | Lovell v Reunion Plaza | Dallas, TX | 2020 |
| Stewart Wiegand Owens, PC | Fisher v Country Trails | Dallas, TX | 2020 |
| Modrall, Sperling Roehl Harris & Sisk, PA | Yoe/Barber v Murtagh | Albuquerque, NM | 2020 |
| Stewart Wiegand & Owens, PC | Patterson v Midlothian | Dallas, TX | 2021 |
| Hallett & Perrin, PC | Isaac v Heritage at Longview | Dallas, TX | 2021 |
| Quillin Law Firm, PC | Hembree v Oceans Behavioral Hospital | Dallas, TX | 2021 |
| Plunkett Griesenbeck & Mimari, Inc. | Umphers / Deskin v Post-Acute / Warm Springs | San Antonio, TX | 2021 |
| Stewart Wiegand & Owens, LLP | Tranberg/Forgey v Broadmoor | Dallas, TX | 2021 |
| Hastings Law Firm, PC | Sturgill, Gary v Richmond Healthcare Center | The Woodlands, TX | 2021 |
| Preston Law Firm, LLC | Busby/Huckaby v Three Forks Senior Living of Forney | New Orleans, LA | 2021 |
| Watson Caraway Midkiff & Luningham, LLP | Eldridge v Lockney | Fort Worth, TX | 2021 |
| Adelman Law Firm | Howard v Nexion Health at Natchez | Memphis, TN | 2022 |
| Crow & Dunlevy | Griggs/Bertschinger v Touchmark | Tulsa, OK | 2022 |
| Otjen Law Firm, S.C. | Kaminski v Terrace at St. Frances | Waukesha, WI | 2022 |
| Otjen Law Firm, S.C. | Osum v Franciscan Woods | Waukesha, WI | 2022 |
| Johnson & Bell, LTD | Satka v Bria of Palos Hills | Chicago, IL | 2023 |

Robert H. Kelly, M.D. PLLC
929 College Avenue
Fort Worth, Texas 76104
DEPOSITION TESTIMONY LIST
2020 - 2024

Updated:  March 13, 2024

| RETAINING ATTORNEY | CASE STYLE | LOCATION | YEAR |
|---|---|---|---|
| Otjen Law Firm, S.C. | Rosholt v Alexian Village | Waukesha, WI | 2023 |
| Atwood Malone Turner & Sabin, PA | Valdez v Sautter/Mays | Roswell, NM | 2023 |
| Stephen W. Johnson & Associates, P.C. | Dokupil v Kreis | Dallas, TX | 2023 |
| Butt Thornton & Baehr, P.C. | Machemehl v Sound Physicians | Albuquerque, NM | 2023 |
| Atwood Malone Turner & Sabin, P.A. | Valdez v Sautter /Mays | Roswell, N | 2023 |
| Johnson & Carter, PC | Dokupil v Kreis | Dallas, TX | 2023 |
| Butt Thornton & Baehr, P.C. | Machemehl/Cribari v Sound Physicians | Albuquerque, NM | 2023 |
| US Dept of Justice | Warrick v USA | Chicago, IL | 2024 |
| Stewart Wiegand & Owens PC | Platt v Cityview Nursing & Rehab | Dallas, TX | 2024 |